INJURED WORKERS OF KANSAS, *et al., Appellants,* v. WAYNE L. FRANKLIN, Secretary of Human Resources, and PHILIP S. HARNESS, Director of Workers Compensation, *Appellees.*

No. 77,561

OLIVER GETTLE, *Appellant,* v. WAL-MART, *Appellee,* and NATIONAL UNION FIRE INSURANCE COMPANY, *Insurance Carrier.*

(942 P.2d 591)

Opinion filed July 18, 1997.

*Timothy A. Short*, of Spigarelli, McLane & Short, of Pittsburg, argued the cause, and *Patrick R. Nichols*, of Topeka, *Kelly W. Johnston*, of The Johnston Law Offices, P.A., of Wichita, and *Thomas E. Hammond*, of Render, Kamas and Hammond, of Wichita, were with him on the briefs for appellants.

*Fred J. Logan, Jr.*, of Logan & Logan, of Prairie Village, argued the cause, and *A. J. Kotich*, of Kansas Department of Human Resources, was with him on the brief for appellees Franklin and Harness.

*Christopher J. McCurdy*, of Wallace, Saunders, Austin, Brown & Enochs, Chartered, of Wichita, argued the cause, and *Michael D. Streit*, of the same firm, was with him on the brief for appellee Wal-Mart.

The opinion of the court was delivered by

ABBOTT, J.: The 1993 Kansas Legislature passed sweeping changes to the Workers Compensation Act (Act). Five of those amendments are challenged in this appeal, as well as the Act as a whole. The plaintiffs contend the amendments and the Act as a whole unconstitutionally violate due process, equal protection, and the separation of powers doctrine. The plaintiffs are a variety of individuals, groups, and labor organizations. The standing of the plaintiffs and the procedure they used to reach this court (declaratory action) are not an issue. The trial court held the Act and the amendments are constitutional, and this appeal followed.

At the start of the 1993 legislative session, legislators had before them the reports of the Governor's Task Force on Workers Compensation, the Insurance Commissioner's Workers Compensation Task Force, and the Legislative Post Audit Committee, all of which suggested areas of the workers compensation system that the various committees determined needed reform. Over the course of the session, the House Committee on Labor and Industry and the Senate Committee on Commerce conducted hearings and heard from witnesses representing employees, employers, trial lawyers, labor organizations, and business associations. S.B. 307, which dealt with safety issues, was used as the vehicle for workers compensation reform. The legislation passed unanimously in both the House and Senate, and Governor Finney signed the bill into law.

Once the bill passed in 1993, several parties filed a petition for declaratory judgment in Shawnee County District Court, asking the trial court to declare nine of the Act's amendments unconstitutional and void. These plaintiffs filed their declaratory judgment action against George Gomez, then the Director of the Division of Workers Compensation, and against Joe Dick, then the Secretary of Human Resources, who oversaw the Division of Workers Compensation and the implementation of the Act. Wayne L. Franklin is now the Secretary of Human Resources, and Philip S. Harness is the Director of Workers Compensation. These parties are now the named defendants in the declaratory judgment case.

The trial court heard oral arguments on summary judgment motions filed by both the plaintiffs and the defendants. On June 4,

1996, the trial court filed a memorandum decision and order. The court denied the plaintiffs' motion for summary judgment and granted the defendants' motion for summary judgment, finding that all nine challenged amendments to the Act withstood constitutional scrutiny. The plaintiffs timely filed a notice of appeal with the Court of Appeals. This court granted the plaintiffs' motion to transfer the case to the Supreme Court.

On appeal, the plaintiffs raised only five issues instead of the nine issues that they raised at the trial court level. The four issues which were abandoned raised the constitutionality of certain amendments that were the only amendments affecting some of the individual plaintiffs. These plaintiffs still have standing in this appeal because they also challenge the constitutionality of the entire Act, not just certain amendments.

In a separate action, plaintiff Oliver C. Gettle filed a workers compensation claim with the Division of Workers Compensation on March 8, 1994. Gettle was a 64-year-old Wal-Mart employee who injured his right hand, right arm, and right shoulder while he was moving paint cans to overhead shelving. Upon treatment, it was discovered Gettle had partially torn the rotator cuff in his shoulder. Based on the American Medical Association Guides to the Evaluation of Permanent Impairment (4th ed. 1995) (AMA Guides), Gettle's doctor found that Gettle had a partial permanent impairment to the right shoulder of 15%, which was equivalent to 9% of the whole body.

The Division of Workers Compensation heard Gettle's workers compensation claim and awarded him compensation. The issue at the hearing was whether "K.S.A. 44-510d(a)(13), stating that the loss of an arm, including the shoulder joint, shoulder girdle, shoulder musculature or any other shoulder structures is a scheduled injury with recovery limited to 225 weeks [,is] constitutional?" The administrative law judge found that he had no jurisdiction to determine whether K.S.A. 44-510d was constitutional. Thus, following the statute, the judge limited Gettle to a 15% scheduled impairment to his right shoulder with benefits calculated for 225 weeks. The judge awarded Gettle compensation for 25.5 weeks at a rate of $101.88 per week, or $2,597.94, followed by 29.92 weeks

at $101.88 per week, or $3,048.24, making a total award of $5,646.18.

Gettle filed an application for review with the Workers Compensation Board (Board). Gettle asked the Board to review the administrative law judge's award and challenged the constitutionality of K.S.A. 44-510d(a)(13), which classifies shoulder injuries as scheduled injuries. On August 28, 1996, the Board ruled that it was not a Kan. Const. art. III court and that it did not have the authority to hold an act of the Kansas Legislature unconstitutional. Thus, the Board found that it was obligated to enforce the provisions of K.S.A. 44-510d(a)(13), as enacted, and treat Gettle's shoulder injury as a scheduled injury. The Board affirmed the award entered by the administrative law judge.

Gettle appealed to the Court of Appeals and filed a motion to consolidate his case with this declaratory judgment case. This court granted Gettle's motion. Pursuant to K.S.A. 20-3018(c), Gettle's case, No. 77,561, was transferred to this court and consolidated for review and determination under case No. 77,142. See Supreme Court Rule 2.06 (1996 Kan. Ct. R. Annot. 16).

"Determining whether a statute violates the constitution is a question of law. When determining a question of law, this court may exercise an unlimited de novo standard of review. See *State v. Mertz*, 258 Kan. 745, 748, 907 P.2d 847 (1995). 'A statute is presumed constitutional, and all doubts must be resolved in favor of its validity. If there is any reasonable way to construe a statute as constitutionally valid, the court must do so. A statute must clearly violate the constitution before it may be struck down.' *State v. Scherzer*, 254 Kan. 926, Syl. ¶ 6, 869 P.2d 729 (1994); *Boatright v. Kansas Racing Comm'n*, 251 Kan. 240, 243, 834 P.2d 368 (1992). 'This court not only has the authority, but also the duty, to construe a statute in such a manner that it is constitutional if the same can be done within the apparent intent of the legislature in passing the statute.' *State v. Durrant*, 244 Kan. 522, 534, 769 P.2d 1174, *cert. denied* 492 U.S. 923 (1989)." *Lemuz v. Fieser*, 261 Kan. 936, 943, 933 P.2d 134 (1997).

## I. 10-DAY NOTICE OF INJURY RULE

Prior to 1993, the Act required a worker to file a workers compensation claim within 200 days of an injury and to give notice of such injury to his or her employer within 10 days of the injury as a condition precedent to filing a valid workers compensation claim, unless the employer or its agent had actual knowledge of the injury.

K.S.A. 44-520 (Ensley 1986); K.S.A. 44-520a (Ensley 1986). This notice of claim requirement specifically provided:

"Proceedings for compensation under the workmen's compensation act shall not be maintainable unless notice of the accident, stating the time and place and particulars thereof, and the name and address of the person injured, shall have been given to the employer within ten (10) days after the date of the accident: *Provided*, That actual knowledge of the accident by the employer or his duly authorized agent shall render the giving of such notice unnecessary: *Provided further*, That *want of notice or any defect therein shall not be a bar unless the employer prove that he has been prejudiced thereby.*" K.S.A. 44-520 (Ensley 1986). (Emphasis added.)

Under this notice of claim requirement, if the worker did not give notice of an injury within 10 days of the injury, lack of notice was not a bar to the workers compensation claim unless the employer could prove that such lack of notice was prejudicial to it.

In 1993, the legislature amended the Act so that the failure to provide an employer with notice of an injury within 10 days of the injury acts as a bar to a workers compensation claim unless the employer or its agent had actual notice of the injury or the employee had "just cause" in failing to provide notice. Further, this 1993 amendment bars a workers compensation claim if an employee fails to give notice of an injury to the employer within 75 days of the injury, even if the employee had just cause for such failure, unless the employer or its agent had actual notice of the accident, the employer was unavailable to receive notice, or the employee was physically unable to give notice. L. 1993, ch. 286, § 42. Specifically, this amendment provided:

"Except as otherwise provided in this section, proceedings for compensation under the workers compensation act shall not be maintainable unless notice of the accident, stating the time and place and particulars thereof, and the name and address of the person injured, is given to the employer within 10 days after the date of the accident, except that actual knowledge of the accident by the employer or the employer's duly authorized agent shall render the giving of such notice unnecessary. The ten-day notice provided in this section shall not bar any proceeding for compensation under the workers compensation act if the claimant shows that a failure to notify under this section was due to just cause, except that in no event shall such a proceeding for compensation be maintained unless the notice required by this section is given to the employer within 75 days after the date of the accident unless (a) actual knowledge of the accident by the employer

or the employer's duly authorized agent renders the giving of such notice unnecessary as provided in this section, (b) the employer was unavailable to receive such notice as provided in this section, or (c) the employee was physically unable to give such notice." K.S.A. 44-520.

Under the 1993 amendment, the employer does not have to prove that lack of timely notice prejudiced it in order for the lack of timely notice to act as a bar to an employee's workers compensation claim. Based on this new notice of claim requirement, workers compensation plaintiffs have to notify the employer of an injury within 10 days of the occurrence of an injury, or within 75 days at the most, while typical tort victims have to file suit and notify the defendant of the injury within 2 years of the discovery of an injury, or in some cases within 8 years of the occurrence of the injury.

The plaintiffs challenge the new notice of claim requirement as a violation of equal protection and due process.

## A. Equal Protection

The plaintiffs contend that K.S.A. 44-520 unconstitutionally violates the Equal Protection Clause of the United States Constitution. The principle of equal protection relevant to the plaintiffs' claim is embodied in § 1 of the Kansas Constitution Bill of Rights. See *Stephens v. Snyder Clinic Ass'n*, 230 Kan. 115, 127-28, 631 P.2d 222 (1981). This section provides: "All men are possessed of equal and inalienable natural rights, among which are life, liberty, and the pursuit of happiness."

The equal protection provision of the United States Constitution is found in the 14th Amendment, which provides:

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges and immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; *nor deny to any person within its jurisdiction the equal protection of the laws.*" (Emphasis added.)

" ' " 'Equal protection' . . . emphasizes disparity in treatment by a State between classes of individuals whose situations are arguably indistinguishable." ' " *Ernest v. Faler*, 237 Kan. 124, 129, 697 P.2d 870 (1995) (quoting *Ross v. Moffitt*, 417 U.S. 600, 41 L.

Ed. 2d 341, 94 S. Ct. 2437 [1974]). Thus, equal protection is only implicated when a statute treats "arguably indistinguishable" classes of people differently. *Smith v. Printup*, 254 Kan. 315, 321, 866 P.2d 985 (1993). People injured on the job and people injured elsewhere are arguably indistinguishable in a legal sense. Neither party argues otherwise. Since K.S.A. 44-520 treats these two arguably indistinguishable groups differently in regard to the notice of claim requirement, K.S.A. 44-520 implicates equal protection.

The rational basis standard (sometimes referred to as reasonable basis test) is applied to laws which result in a shorter statute of limitations or a shorter notice of claim statute for a certain nonsuspect class of citizens. *Stephens*, 230 Kan. at 130; see *Ernest*, 237 Kan. at 129-30. Under this standard, a law is constitutional, despite some unequal classification of citizens, if the "classification bears some reasonable relationship to a valid legislative objective." *Farley v. Engelken*, 241 Kan. 663, Syl. ¶ 3, 740 P.2d 1058 (1987).

*Leiker v. Gafford*, 245 Kan. 325, 363-64, 778 P.2d 823 (1989), explains the rational basis standard as follows:

> "The 'reasonable basis' test is violated only if the statutory classification rests on grounds wholly irrelevant to the achievement of the State's legitimate objective. The state legislature is presumed to have acted within its constitutional power, even if the statute results in some inequality. Under the reasonable basis test, a statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it."

In *Peden v. Kansas Dept. of Revenue*, 261 Kan. 239, 258-59, 930 P.2d 1 (1966), *Cert. denied* 520 U.S. 1229 (1997), this court elaborated on the rational basis standard:

> "The rational basis standard is a very lenient standard. All the court must do to uphold a legislative classification under the rational basis standard is perceive any state of facts which rationally justifies the classification. *Kellems v. Commissioner of Internal Revenue*, 58 T.C. 556, 558 (1972), *aff'd* 474 F.2d 1399 (2d Cir.), *cert. denied* 414 U.S. 831 (1973). 'Relevance is the only relationship required between the classification and the objective.' *Stephenson*, 250 Kan. at 774. See also *Stephens v. Snyder Clinic Ass'n*, 230 Kan. 115, 129, 631 P.2d 222 (1981) (stating that a classification which may result in some inequality only violates equal protection if the classification is 'irrelevant' to the goals the State intended to achieve through passage of the statute). A classification is 'relevant' to its intended goal if it is rationally related to the legitimate legislative purpose behind the statute.

*Thompson v. KFB Ins. Co.*, 252 Kan. 1010, 1018, 850 P.2d 773 (1993). However, a statute cannot classify persons into groups based on a criteria which is 'wholly unrelated' to the goal of the statute. *Henry*, 213 Kan. at 753-54. A classification ' " 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.' " ' *Thompson*, 252 Kan. at 1018 (quoting *Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 64 L. Ed. 989, 40 S. Ct. 560 [1920]).

"Although the rational basis standard requires that the discriminatory classification . . . be rationally related to valid state interests or goals, the standard does not require that the classification be the perfect solution to achieve such goals. See *Thompson*, 252 Kan. at 1021 (When the legislature must draw a line and ' " 'there is no mathematical or logical way of fixing it precisely, the decision of the legislature must be accepted unless [the court] can say that it was very wide of any reasonable mark.' " '); *Liggett*, 223 Kan. at 619 ('Establishment of classifications with mathematical precision is not required.')."

The State's espoused purpose of K.S.A. 44-520 is to speed up the claim process and to reduce fraudulent claims. The defendants point to the Legislative Post Audit Committee Report, which identified the five most significant workers compensation problem areas as stated by insurers, employers, attorneys, judges, and officials. The report stated that two of these five concerns were the length of the workers compensation claim process and the frequency of fraudulent claims. In listing these concerns, the report cited the New York Times, which estimated that as much as 30% of all workers' compensation claims could be fraudulent. These two concerns are valid legislative objectives.

The new notice of claim requirement is rationally related to these valid state objectives. The amendment speeds up the claim process because it requires the entire claim process to begin earlier than it otherwise would have. K.S.A. 44-520 does not require a worker to actually file a claim earlier than previously required (200 days after injury). However, K.S.A. 44-520 does strongly encourage a worker to provide an employer with timely notice of an injury by imposing harsher consequences if timely notice is not provided. A worker will more likely give timely notice of an injury, and the employer can begin investigations, medical treatment, and settlement evaluations earlier than it previously would have. Thus, even though K.S.A. 44-520 does not require an employee to actually file

a claim earlier than previously required, the new notification requirement does require the entire claim "process" to begin earlier than it otherwise would have, thereby speeding up the claim process.

Since K.S.A. 44-520 encourages employees to give timely notice, an employer will typically have notice of any injury sooner than it otherwise would have. This early notification allows an employer to investigate claimed injuries while the work place is still set up the same way and while the facts of the incident are still fresh. This early investigation will allow an employer an opportunity to discover fraudulent claims and to defend against them. The new notification requirement should lead to a reduction in the number of fraudulent claims, if there are any. Thus, the new notice requirement is rationally related to two valid state objectives—speeding up the claim process and reducing fraudulent claims.

There has always been a 10-day notice of claim requirement in the Act. The original notice of claim statute did not bar a claim for workers compensation if the notice was untimely unless the employer could prove it was prejudiced by the untimely notice. The original purpose of this notice requirement was to "afford the employer an opportunity to investigate the accident and to furnish prompt medical treatment." *Pike v. Gas Service Co.*, 223 Kan. 408, 409, 573 P.2d 1055 (1978). This court considered this to be a valid purpose for the notice requirement. As such, the original notice statute was rationally related to valid legislative objectives—allowing an employer the opportunity to investigate an accident and furnish prompt medical treatment.

Based on *Ernest v. Faler*, 237 Kan. 125, the plaintiffs argue that the similar notice of claim statute at issue herein violates equal protection because it is not rationally related to the legislative objectives sought of speeding up the claim process time or reducing fraudulent claims. The plaintiffs point out that neither the Legislative Post Audit Committee Report nor any other material submitted suggests that barring claims after 10 days will reduce fraud or speed up the claim process.

The plaintiffs point out that, according to the Kansas Workers Compensation Handbook § 14.01, p. 14-2 (rev. ed. 1990), no cases

were reported where an employer was able to show prejudice from an employee's untimely notice under the original notification requirement. The plaintiffs apparently interpret this information as indicating that no fraudulent claims were filed or allowed to proceed; thus, no prejudice to the employer occurred under the old notification statute. Since fraud was not encouraged by the original notice provision, the plaintiffs claim it will not be discouraged by the new provision. Thus, the plaintiffs assert that the new notice requirement is not rationally related to the legitimate State interest of reducing fraudulent claims.

Further, even if the new notice of claim statute does actually reduce fraudulent claims more than the original notice of claim statute did, the plaintiffs argue that the new notice of claim statute must have a rational reason for only applying to one particular class of people. According to the plaintiffs, there must be a reason to constitutionally justify why workers compensation plaintiffs have a different notice requirement applied to them than the notice requirement applied to all other tort plaintiffs, and such a reason does not exist here. The plaintiffs claim that the mere fact a plaintiff is injured at work does not create such a potential for fraud that a worker's notification time period should be reduced from 2 years, as allowed for most torts, to 10 days. The plaintiffs claim that the new notice of claim requirement, applied only to claimants injured on the job, is not rationally related to the legitimate state interest of reducing fraudulent claims.

Finally, even if there is a justification to apply the new notice of claim statute only to injured workers, the plaintiffs claim that there is no basis for the 10-day/75-day rule as opposed to a 20-day/100-day rule. According to the plaintiffs, there is no rational reason why the new 10-day/75-day rule reduces fraudulent claims or speeds up the claim process any better than a 20-day/100-day rule would. As such, the plaintiffs assert that the new notification requirement is not rationally related to the valid state objectives of speeding up the claim process or reducing fraudulent claims.

The plaintiffs have attacked the new notice statute as facially unconstitutional; thus, the plaintiffs must establish that no set of circumstances exist under which the amendment would be valid.

Simply pointing out that the amendment might not be rationally related to the state objectives sought under one set of facts is not enough to declare the amendment unconstitutional on its face. See *United States v. Salerno*, 481 U.S. 739, 745, 95 L. Ed. 2d 697, 107 S. Ct. 2095 (1987).

The new notice requirement can cut off nonfraudulent claims. However, this does not take away from the fact that the notice requirement also cuts off fraudulent claims and is rationally related to this goal. The mere fact that the notice requirement is overbroad in achieving its goals is not a reason to find that it violates equal protection. See *Peden*, 261 Kan. at 258 ("Although the rational basis standard requires that the discriminatory classification . . . be rationally related to valid state interests or goals, the standard does not require that the classification be the perfect solution to achieve such goals."). Further, the new notice requirement includes provisions to prevent the statute from being applied in an overbroad manner and barring nonfraudulent claims. For instance, the new notice requirement does not bar a claim for untimely notice (after 10 days) if the employee can show just cause. While the requirement does bar a claim if notice is not given within 75 days of injury, even with just cause, the statute does provide exceptions for a few of the most common reasons for such a delay in notice—the employer already knew about the accident, the employer was unavailable to receive notice, or the employee was unable to give notice. Thus, the legislature has taken care to make sure the new notice requirement is not applied in an unreasonably overbroad manner.

Further, even if the statute could be applied in an unreasonably overbroad manner by dismissing numerous nonfraudulent claims, this does not mean that it will be. "Under the reasonable basis test, a statutory discrimination will not be set aside if *any* state of facts reasonably may be conceived to justify it." *Leiker*, 245 Kan. at 363-64. Such a state of facts can be conceived here in which the amendment will be applied narrowly with a focus on dismissing untimely filed fraudulent claims.

The plaintiffs also claim that the amendment is not rationally related to the goal of reducing fraudulent claims because the orig-

inal notification requirement already did a good job of cutting off fraudulent claims. The plaintiffs base this contention on the fact that few, if any, employers could show prejudice from untimely notice under the old provision. Thus, the plaintiffs argue fraudulent claims must not have been filed, or the employers could have proven prejudice. The very fact that few, if any, employers could prove prejudice for untimely notice under the old notification requirement indicates how difficult it is for an employer to discover a fraudulent claim and prove prejudice from it. To believe, as the plaintiffs do, that simply because prejudice (*i.e.*, fraudulent claims) cannot be proven under the original notice provision means that fraudulent claims do not exist is not a justified conclusion. Even if the old notice requirement does a great job of discouraging fraudulent claims, this does not mean that a new, stricter notice requirement could not do an even better job.

Next, the plaintiffs question why the new notice requirement is only applied to injured workers and not to all injured plaintiffs and how this classification is rationally related to the objectives sought. The new notice provision is only applied to workers compensation plaintiffs because it is more important to achieve the goals sought by the notice requirement in the workers compensation area than in any other area of compensable injury. In 1911, the legislature abolished a plaintiff's right to sue an employer for damages caused by the negligence of the employer. In place of this right, the legislature gave employees the Workers Compensation Act, which is supposed to provide a quick, set amount of money, without proof of employer negligence, for all employees injured on the job. The fact that a claim will be speedily processed is a part of the quid pro quo for the abrogation of the plaintiff's common-law right to sue a negligent employer. Thus, it is important that claims in workers compensation cases be quickly processed. Workers compensation claims do not require proof of negligence, only proof of an injury. Thus, it makes sense that the opportunity to file fraudulent workers compensation claims is much greater than the opportunity to file fraudulent tort claims. It is easier to fake the cause of an injury than to fake negligence. Since the goals of the new notice requirement—speed up claim process time and reduce fraudulent

claims—are more of a concern in the workers compensation area, it makes sense that the means to achieve these goals—the new notice requirement—should only be applied to the class of plaintiffs subject to the Act and not to all plaintiffs.

Finally, the plaintiffs claim that there is no basis for the 10-day/75-day rule as opposed to a 20-day/100-day rule. It is true that a 20-day/100-day rule might have been able to achieve the same goals which the notice statute at issue was enacted to achieve, with the same success. "When the legislature must draw a line and ' " 'there is no mathematical or logical way of fixing it precisely, the decision of the legislature must be accepted unless [the court] can say that it was very wide of any reasonable mark.' " ' " *Peden*, 261 Kan. at 258-59 (quoting *State ex rel. Schneider v. Liggett*, 223 Kan. 610, 619, 576 P.2d 221 [1978]). This court cannot say that the 10-day/75-day rule was wide of any reasonable mark in obtaining the legislative goals sought.

Finally, the main case relied on by the plaintiffs in support of their position, *Ernest*, 237 Kan. 125, is distinguishable from the case at hand. *Ernest* involved a notice of claim statute, but the notice required did not allow for a quick investigation, nor did the notice help speed up the process. Here, the notice of claim statute, which requires that notice be given to the defendant/employer and not to an irrelevant third party, does bear a rational relationship to the valid legislative objectives sought of speeding up the claim process time and reducing fraudulent claims. The new strict notice of claim statute does not violate equal protection.

## B. Due Process

The plaintiffs contend that K.S.A. 44-520 unconstitutionally violates the Due Process Clause of the Kansas Constitution. Due process is embodied in § 18 of the Kansas Constitution Bill of Rights, which provides: "**Justice without delay.** All persons, for injuries suffered in person, reputation or property, shall have remedy by due course of law, and justice administered without delay." The due process provision of the United States Constitution is found in the 14th Amendment, which provides in pertinent part that no state shall "deprive any person of life, liberty, or property,

without due process of law." " ' " 'Due process' emphasizes fairness between the State and the individual dealing with the State, regardless of how other individuals in the same situation may be treated." ' " *Ernest*, 237 Kan. at 129 (quoting *Ross v. Moffitt*, 417 U.S. 600).

The plaintiffs claim that their due process rights have been violated because their remedy in a workers compensation claim has been restricted due to a more stringent notice of claim statute. In analyzing a potential due process violation, the following test should be utilized:

" 'If a remedy protected by due process is abrogated or restricted by the legislature, "such change is constitutional if '[1] the change is reasonably necessary in the public interest to promote the general welfare of the people of the state,' *Manzanares v. Bell*, 214 Kan. 589, 599, 522 P.2d 1291 (1974), and [2] the legislature provides an adequate substitute remedy" to replace the remedy which has been restricted.' *Bonin v. Vannaman*, 261 Kan. 199, 217, 929 P.2d 754 (1996) (citing *Aves v. Shah*, 258 Kan. 506, 521, 906 P.2d 642 [1995])." *Lemuz v. Fieser*, 261 Kan. 936, 946-47, 933 P.2d 134 (1997).

Under Step 1 of this due process test, the first question to ask is whether the new notice of claim statute imposed on plaintiffs injured at work, which restricts the plaintiffs' right to a workers compensation remedy, is reasonably necessary in the public interest to promote the general welfare of the people of the state. Another way to state this test is whether the legislative means selected (the notice requirement) has a real and substantial relation to the objective sought. See *Bonin v. Vannaman*, 261 Kan. 199, 217, 929 P.2d 754 (1996) (citing *Liggett*, 223 Kan. at 614; *Manzanares v. Bell*, 214 Kan. 589, 599, 522 P.2d 1291 (1974); *Ernest*, 237 Kan. at 129).

Step 1 of a due process analysis is similar to the rational basis standard of an equal protection analysis. "In referring to an analysis under Step 1 of the § 18 test, the *Bonin* court stated that ' "[t]he test in determining the constitutionality of a statute under due process or equal protection weighs almost identical factors." ' *Bonin*, 261 Kan. at 218 (quoting *Clements v. United States Fidelity & Guaranty Co.*, 243 Kan. 124, 127, 753 P.2d 1274 [1988])." *Lemuz*, 261 Kan. at 948. As previously analyzed in the equal protec-

tion section, the State has a legitimate interest in speeding up claim process and reducing fraudulent claims. Further, the new notice requirement is rationally related to these valid objectives. In other words, the new notice requirement is a legislative means which has a real and substantial relation to the objectives sought—speeding up the claim process and reducing fraudulent claims. Thus, the new notice requirement satisfies Step 1 of the due process test.

"However, this is not where the [due process] review stops. '[E]ven if the modification of a common-law remedy is consistent with public policy, this does not necessarily satisfy the due process concerns. In order to insure due process, the legislature is required to provide an adequate, substitute remedy when a common-law remedy . . . is modified or abolished.'" *Lemuz*, 261 Kan. at 948 (quoting *Aves v. Shah*, 258 Kan. 506, 522, 906 P.2d 642 [1995]).

See *Bonin*, 261 Kan. at 218.

In applying Step 2 of the due process test, it is important to realize that the workers compensation remedy is not a common-law remedy. Rather, it is an adequate substitute remedy itself (or quid pro quo) for the abrogation of a worker's right to sue an employer for an on-the-job injury caused by the employer's negligence.

In 1911, the legislature stripped employees of their common-law right to bring a civil action against employers for injuries caused by an employer's negligence. "The legislature can modify the common law so long as it provides an adequate substitute remedy for the right infringed or abolished." *Kansas Malpractice Victims Coalition v. Bell*, 243 Kan. 333, 350, 757 P.2d 251 (1988), *overruled in part on other grounds Bair v. Peck*, 248 Kan. 824, 811 P.2d 1176 (1991). Thus, when the legislature abolished the employees' common-law right to sue employers for injuries, the legislature provided the employees with an adequate substitute remedy (or quid pro quo) for the right abolished—the Workers Compensation Act. The Act allowed employees to quickly receive a smaller, set amount of money for injuries received at work, whether they were caused by negligence or not, as long as the notice requirement was met. Now, the legislature has made the notice requirement more strict so that workers compensation benefits are more difficult to receive, making the quid pro quo for abrogation of the employee's right to

sue an employer for negligence less than what it once was. Thus, the question under Step 2 of the due process test is not whether the legislature provided an adequate substitute remedy for taking away the lenient notice requirement in the Act. Instead, the question becomes whether it has, under the Act, with its stricter notice requirement, become so difficult to receive an award that the Act is no longer an adequate substitute remedy for abrogation of employees' right to sue employers for negligence. If so, then the stricter notice requirement, making the quid pro quo inadequate, violates due process. The plaintiffs make a number of other arguments concerning an adequate quid pro quo, and we will consider this matter under issue V later in this opinion.

## II. SHOULDER INJURIES

The Act recognizes two different classes of injuries which do not result in death or disability—permanent disability to a scheduled body part or permanent partial general disability. K.S.A. 44-510d; K.S.A. 44-510e.

Prior to 1993, both shoulder and hip injuries were treated as permanent partial general disabilities. See *Bryant v. Excel Corp.*, 239 Kan. 688, 722 P.2d 579 (1986); K.A.R. 51-7-8(d)(3). In the 1993 amendments to the Act, the legislature reclassified shoulder injuries as a permanent disability to a scheduled body part, making an employee with an injured shoulder entitled to 66⅔% of the employee's average weekly gross salary for 225 weeks, regardless of the employee's lost earning capacity, because of the employee's inability to perform work of the same type or character as the work performed before the injury occurred. Hip injuries are still classified as permanent partial general disabilities. In fiscal year 1990, 2,614 shoulder injuries were reported to the Division of Workers Compensation, while only 528 hip injuries were reported that year. 16th Annual Statistical Report of the Division of Workers Compensation, pp. 25-26 (1990). In fiscal year 1994, 3,492 shoulder injuries were reported to the Division of Workers Compensation, while only 602 hip injuries were reported. 20th Annual Statistical Report of the Division of Workers Compensation, pp. 25-26 (1994).

The plaintiffs contend that this change was made in the Act because over the past 15 years, certain industries in Kansas have experienced a high incidence of repetitive overuse injuries to arms and shoulders, which qualified as general disabilities. These industries experienced increases in their workers compensation claims and payments, resulting in an increase in their workers compensation insurance premiums. The plaintiffs challenge K.S.A. 44-510d(a)(13), which reclassifies a shoulder injury as a scheduled injury, as a violation of equal protection and due process.

## A. Equal Protection

The plaintiffs contend that K.S.A. 44-510d(a)(13) classifies workers with a shoulder injury differently from workers with a hip injury and allows less compensation to the shoulder injury victims. According to the plaintiffs, this distinction creates a disparity between two classes of similarly situated persons without a rational basis, thereby violating equal protection.

A law is constitutional, despite some unequal classification of citizens, if the "classification bears some reasonable relationship to a valid legislative objective." *Farley v. Engelken*, 241 Kan. 663, Syl. ¶ 3, 740 P.2d 1058 (1987). Equal protection is only implicated when a statute treats "arguably indistinguishable" classes of people differently. *Smith v. Printup*, 254 Kan. 315, 321, 866 P.2d 985 (1993).

The first question to ask in an equal protection analysis is whether the two classes of people who are treated differently by the legislature are "arguably indistinguishable." The plaintiffs contend that victims of shoulder injuries are similarly situated or "arguably indistinguishable" from victims of hip injuries because both the shoulder joint and the hip joint "connect" scheduled extremities (arms and legs) to the trunk of the body. Further, both the shoulder and the hip have muscles, ligaments, bones, blood vessels, and nerves that attach to, or affect, various structures that are considered to be part of the trunk of the body. In support of their argument, the plaintiffs cite to *Stephenson v. Sugar Creek Packing*, 250 Kan. 768, 830 P.2d 41 (1992), which, in their view, holds that arm injuries and leg injuries are arguably indistinguishable.

In *Stephenson,* the plaintiff was injured on the job due to carpal tunnel syndrome she experienced in both arms. Based on a 1987 amendment, under 44-510d(a)(23), Stephenson was awarded compensation as if she had a scheduled injury instead of a general injury. Prior to the enactment of 44-510d(a)(23), an employee who suffered the same injury in both opposite extremities was considered to have a general disability. The amended statute provided that repetitive use injuries occurring in opposite upper extremities should be treated as scheduled injuries rather than a general disability. Stephenson appealed her workers compensation award, challenging the statute as an unconstitutional violation of equal protection. Stephenson argued that 44-510d(a)(23) violated equal protection because it classified repetitive injuries to the opposite upper extremities differently from single trauma injuries to the opposite upper extremities and awarded the victims of repetitive use injuries less compensation without a rational basis.

In analyzing Stephenson's argument, this court found that the statute also classified repetitive injuries to opposite upper extremities (arm injuries) differently from injuries to the lower opposite extremities (leg injuries). The court found that an employee who suffers an injury to both arms and an employee who suffers an injury to both legs are similarly situated. Since the State did not enumerate a rational basis to justify treating these two similarly situated groups differently, this court found the statute was an unconstitutional violation of equal protection. 250 Kan. at 781-82. In so holding, the court stated:

"In the present case, Stephenson's argument unnecessarily narrows the focus of our inquiry. The *workers dissimilarly treated are* not just those sustaining carpal tunnel conditions from sudden versus repeated trauma, but *all workers with bilateral repetitive use conditions of the upper extremities and workers who suffer any other injuries to both opposite extremities. These classifications of workers are similarly situated* with respect to the goal of cost cutting, but they do not receive like treatment. The equal protection guarantee of the United States Constitution does not preclude the State from classifying persons for purposes of legislation, but it does require that persons similarly situated be treated alike." 250 Kan. at 781-82.

Since workers with injuries to both upper extremities (injuries to both arms) are similarly situated to workers with injuries to both

lower extremities (injuries to both legs), the plaintiffs assert that workers with shoulder injuries are also similarly situated to workers with hip injuries.

Workers with shoulder injuries are not similarly situated or arguably indistinguishable from workers with hip injuries. Thus, the two classifications of injured workers can be treated differently— one classified as a worker with a general injury and one classified as a worker with a scheduled injury—without implicating equal protection concerns. Workers with shoulder injuries are not similarly situated to workers with hip injuries because it is medically rational to treat a shoulder injury as an impairment to an upper extremity but it is not as medically rational to treat a hip injury as an impairment to a lower extremity. The affidavit of Dr. Baker noted that the AMA Guides evaluate a shoulder injury as an upper extremity impairment. According to Dr. Baker, all shoulder injuries are medically considered impairments of the upper extremity. Not only did Dr. Baker testify that it was rational to consider a shoulder injury to be an upper extremity impairment, he stated that it was "medically illogical" to define a shoulder injury as a whole body impairment. Thus, the two types of injuries can be classified and treated differently without implicating equal protection.

Dr. Baker's testimony was not unopposed. Dr. John J. Wertzberger submitted an affidavit which concluded that it makes "anatomical sense to characterize the shoulder as part of the trunk of the body because the muscles that make up the shoulder originate directly or indirectly on the trunk of the body."

We hold the two types of injuries are not "arguably indistinguishable" and that different classification of the injuries under the Act does not implicate equal protection. It is true that the plaintiffs presented an affidavit to rebut Dr. Baker's affidavit stating that a shoulder injury is logically an arm injury. However, it is not the place of this court to determine which medical evidence the legislature should have relied on or if it needed to rely on any medical evidence at all. The legislature chose to accept that it is anatomically illogical to treat a shoulder injury as a whole body impairment but not as anatomically illogical to treat a hip injury as a whole body

impairment. Based on this medical evidence, shoulder injuries and hip injuries are not arguably indistinguishable.

The plaintiffs also argue in their reply brief that unequal classifications have been created between workers who injured their shoulders prior to the effective date of the 1993 amendment at issue and workers who injured their shoulders after the amendment became effective. This type of class distinction will occur upon the enactment of any new amendment and is not a valid classification on which to base an equal protection argument.

## B. Due Process

The plaintiffs contend that K.S.A. 44-510d(a)(13), which classifies a shoulder injury as a scheduled injury instead of as a whole body injury, violates due process.

The two-step test which is used to analyze a potential due process violation is set out in *Lemuz*, 261 Kan. at 946-47.

Under Step 1 of this test, the first question is whether the shoulder rule, which restricts an employee with a shoulder injury from receiving a nonscheduled remedy, is reasonably necessary in the public interest to promote the general welfare of the people of the state. Another way to state this test is whether the legislative means selected (the shoulder statute) has a real and substantial relation to the objective sought. See *Bonin*, 261 Kan. at 217 (citing *Liggett*, 223 Kan. at 614; *Manzanares*, 214 Kan. at 599; *Ernest*, 237 Kan. at 129).

One objective sought by the shoulder statute was to make the Act more medically rational. According to the testimony of Dr. Baker, the AMA Guides evaluate an injury to the shoulder as an impairment of an upper extremity, not as an impairment of the whole body. Further, Dr. Baker testified that it was "medically illogical" to consider a shoulder injury as a whole body impairment. He testified that it was rational to evaluate a shoulder injury as an upper extremity impairment. As such, classifying a shoulder injury as a scheduled injury instead of a whole body injury is a legislative means which is substantially related to the valid state objective of making the Act more medically sound.

The plaintiffs point out that the legislative history of S.B. 307 contains no testimony that the Act was illogical because the shoulder was treated as part of the body as a whole. The plaintiffs assert that there is no evidence in the legislative history that supports the "medically illogical" argument as having been the genesis of the shoulder legislation. Instead, the plaintiffs allege that the legislative history only demonstrates that employers desired to limit workers compensation payments so their workers compensation premiums would decrease. Despite the fact that the legislature did not enunciate this goal as a reason for passing the amendment at the time, the plaintiffs understand that the goal of making the Act more medically sound may still qualify as a legitimate state objective which the shoulder statute seeks to obtain.

The plaintiffs argue that even if the trial court reasonably relied solely on Dr. Baker's affidavit stating that a shoulder injury is logically seen as a scheduled impairment, the amendment which classifies a shoulder injury as a scheduled impairment is not related to the valid state objective of making the Act more medically and anatomically sound. The plaintiffs contend that it is particularly difficult under the shoulder statute to determine when an injury is merely a scheduled shoulder injury and when an injury crosses the line into the trunk of the body and becomes a whole body injury because many muscles, ligaments, nerves, blood vessels, and bones involve both the shoulder and the trunk of the body. Due to the difficulty in determining whether an employee has suffered a scheduled shoulder injury or a whole body trunk injury, the plaintiffs claim that the shoulder injury amendment will be applied in an inconsistent, irrational, and unpredictable manner. Application of the amendment in an irrational and inconsistent manner cannot result in making the Act more medically sound. Thus, the plaintiffs contend the statute is not related to this state objective.

The plaintiffs concede that it is possible for the shoulder statute to be applied in a rational and consistent manner. However, according to the plaintiffs, the only way this could occur is if all the injuries to muscles, ligaments, nerves, blood vessels, and bones that have anything whatsoever to do with the shoulder are treated as nonscheduled shoulder injuries. This would result in much of the

anatomy related to the shoulder, between the skull and lower rib cage, being treated as a scheduled body part and not as a part of the body as a whole for workers compensation purposes. The plaintiffs claim that the only injury which would qualify as a nonscheduled injury would be an injury to the skull, brain, internal organs, abdominal musculature, pelvis, and hips. Under this application of the amendment, the plaintiffs allege that a greater percentage of the body would be defined as a "scheduled" body part rather than as part of the body as a whole. According to the plaintiffs, such a result does not make any medical or anatomical sense. As such, the plaintiffs assert that the consistent application of the shoulder statute is not related to the legitimate state interest of making the Act more medically and anatomically correct. The plaintiffs conclude that neither a consistent nor an inconsistent application of the statute is substantially related to this valid state objective. Thus, according to the plaintiffs, the shoulder statute violates due process.

We disagree with the plaintiffs' analysis. The goal to make the Act more medically and anatomically accurate is a legitimate state objective. Further, the shoulder statute, which classifies a shoulder injury as a scheduled injury instead of an injury to the body as a whole, is in line with medical evidence. Thus, the shoulder statute is a legislative means which is substantially related to the valid state objective of making the Act more medically sound. The plaintiffs contend that the statute's objective is an after-the-fact rationalization which was never espoused by the legislature as a purpose for the statute. This may be true; however, it does not matter.

" ' "Under the reasonable basis test, it is unnecessary to ascertain the specific purpose the Kansas Legislature espoused, *if any*, in establishing the challenged [statute]." ' [Quoting *Bair v. Peck*, 248 Kan. 824, 834, 811 P.2d 1176 (1991).] . . .

"[B]ecause a legislature is not required to articulate reasons for enacting a statute, 'it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged [statute] actually motivated the legislature.' [*F.C.C. v Beach Communications, Inc.*, 508 U.S. 307, 315, 124 L. Ed. 2d 211, 113 S. Ct. 2096 (1993)]." *Peden*, 261 Kan. at 253-54 (refers to equal protection test, but also applies to Step 1 of the due process test because the two tests weigh the same factors).

Thus, it is irrelevant whether the legislature actually verbalized the goal of making the Act more medically sound when it passed

the shoulder statute. The fact is that the shoulder statute is a legislative means which does in fact fulfill this valid state objective.

The legislature heard all the evidence and relied on the evidence it found to be the most persuasive. It is not this court's job to second-guess the legislature's decision-making process. All the State had to do was offer " '*any* state of facts [which] reasonably may be conceived to justify' " the shoulder statute. *Peden*, 261 Kan. at 252-53. The State did this by offering the facts, according to Dr. Baker's affidavit, that it is medically accurate to treat a shoulder injury as a scheduled body part injury. This fact reasonably justifies the shoulder statute and its goal to make the Act more medically sound.

Finally, the plaintiffs claim that the shoulder statute is not related to the state objective of making the Act more medically accurate because the statute will either be applied inconsistently so that some shoulder injuries are treated as whole body injuries or the statute will be applied consistently so that many injuries of the torso which are tangentially related to the shoulder will be treated as scheduled body part injuries. In either case, medically inaccurate results will occur according to the plaintiffs, and this indicates that the shoulder statute does not further the goal of making the Act more medically accurate.

In other words, the plaintiffs seem to argue that the shoulder statute can be applied in either an overinclusive or underinclusive manner and not further the objective sought. Doctors have been drawing these lines for years, deciding whether an injury is a whole body injury or a scheduled injury under the Act. There is no reason doctors cannot continue to do so under this new amendment. The possibility that the statute might be applied in an overinclusive or underinclusive manner should not destroy the substantial relationship between the amendment and its objective. " '[C]ourts are compelled under a rational-basis review to accept a legislature's generalizations even when there is an imperfect fit between means and ends. A classification does not fail rational-basis review because it "is not made with mathematical nicety. . . ." [Citations omitted.]' " *Peden*, 261 Kan. at 257 (rule refers to an equal protection

test but also applies to Step 1 of due process because the two tests weigh the same factors).

Thus, despite any overinclusion or underinclusion which might occur, the shoulder statute, properly applied, is a legislative means which is substantially related to the valid state objective of making the Act more medically and anatomically accurate. As such, the shoulder statute, which treats shoulder injuries as scheduled injuries, satisfies Step 1 of the due process test.

However, this is not where the due process review stops. Even if the modification of a remedy is consistent with public policy, this does not necessarily satisfy due process concerns. In order to insure due process, the legislature is required to provide an adequate, substitute remedy when a common-law remedy is modified, restricted, or abolished. *Lemuz*, 261 Kan. at 948; *Bonin*, 261 Kan. at 218. Whether there is an adequate quid pro quo for this amendment and for the Act as a whole will be discussed under issue V.

### III. OFFSET OF RETIREMENT BENEFITS

K.S.A. 44-501(h), enacted in 1993, created offsets against the workers compensation benefits to which an injured worker would otherwise be entitled when the worker receives social security retirement benefits or selected private pension retirement benefits. The new subsection provides:

"(h) If the employee is receiving retirement benefits under the federal social security act or retirement benefits from any other retirement system, program or plan which is provided by the employer against which the claim is being made, any compensation benefit payments which the employee is eligible to receive under the workers compensation act for such claim shall be reduced by the weekly equivalent amount of the total amount of all such retirement benefits, less any portion of any such retirement benefit, other than retirement benefits under the federal social security act, that is attributable to payments or contributions made by the employee, but in no event shall the workers compensation benefit be less than the workers compensation benefit payable for the employee's percentage of functional impairment."

The plaintiffs claim that the offsets against workers compensation benefits allowed for social security benefits and for private pension benefits are in violation of equal protection.

### A. Social Security

Subsection (h) allows an offset against workers compensation benefits to which an injured worker would otherwise be entitled for each dollar of social security retirement benefits received by the injured worker, as long as the workers compensation benefits do not dip below the workers compensation benefits payable for the employee's percentage of functional impairment. The plaintiffs point out that this offset is allowed regardless of whether the employer made any contribution to social security on behalf of the injured worker and regardless of the proportion of contributions to social security made by the injured worker or by other employers. The plaintiffs contend that this social security offset provision violates equal protection because it classifies those workers compensation beneficiaries who are receiving social security benefits differently than it classifies those workers compensation beneficiaries who are not receiving social security benefits. Because the statute treats these two classes of people with disparity, by reducing the workers compensation benefits of those who are receiving social security benefits, the plaintiffs claim that the social security offset provision violates equal protection.

The Kansas workers compensation law previously had retirement benefit offset provisions. Those provisions were all held to be constitutional.

In *Baker v. List and Clark Construction Co.*, 222 Kan. 127, 563 P.2d 431 (1977), a worker was killed on the job. His dependents filed a workers compensation claim for death benefits against the employer. The dependents were also eligible for social security death benefits based on the death of their father. As such, the Workers Compensation Director reduced the claimants' workers compensation benefits in relation to the social security benefits received. This reduction in workers compensation benefits was based on K.S.A. 1975 Supp. 44-510b(j) (since repealed), which provided:

"When any benefits are being paid under the federal social security act because of the death of an employee whose dependents are entitled to compensation under this section, the amount of compensation due under this section shall be reduced by an amount equal to one-half (½) of the amount of such social security payments

during the time such social security payments are being made to the workman's dependents. The employer shall receive credit on the payment of future compensation otherwise due under the workmen's compensation act for an amount equal to one-half (½) of the total amount of social security payments made subsequent to a period during which compensation payments were made by the employer, but which are attributable to such period."

The claimants challenged K.S.A. 1975 Supp. 44-510b(j) and its required reduction of their workers compensation benefits as an unconstitutional violation of equal protection. The claimants contended the offset provision discriminated between classes of claimants by reducing workers compensation death benefits of those who were eligible for social security benefits, widows with minors, but not reducing workers compensation death benefits of those claimants who were not eligible for social security benefits, widows without minors.

Applying the rational basis standard, this court held that the offset statute was constitutional. In so holding, this court stated that the offset provision exists

"to prevent duplication of benefits under the Workmen's Compensation Act and the Social Security Act. . . . This statutory scheme appears to be consistent with a leading treatise on workmen's compensation:

'Once it is recognized that workmen's compensation is one unit in an overall system of wage-loss protection, rather than something resembling a recovery in tort or on a private accident policy, the conclusion follows that duplication of benefits from different parts of the system should not ordinarily be allowed. Since most social legislation in the United States has appeared in unrelated fragments, lack of coordination resulting in cumulation of benefits is quite common; but newer legislation, including the Social Security compensation offset provision, is more carefully drawn to prevent this result.' 4 A. Larson, The Law of Workmen's Compensation, Sec. 97.00 (1976).

"The treatise goes on to state:

'Wage-loss legislation is designed to restore to the worker a portion, such as one-half to two-thirds, of wages lost due to the three major causes of wage-loss: physical disability, economic unemployment, and old age. The crucial operative fact is that of wage loss; the cause of the wage loss merely dictates the category of legislation applicable. Now if a workman undergoes a period of wage loss due to all three conditions, it does not follow that he should receive three sets of benefits simultaneously and thereby recover more than his actual wage. He is experiencing only one wage loss and, in any logical system, should receive only one wage-loss benefit. This conclusion is inevitable, once it is recognized that

*workmen's compensation, unemployment compensation, nonoccupational sickness and disability insurance, and old age and survivors' insurance are all parts of a system based upon a common principle.* If this is denied, then all coordination becomes impossible and social legislation becomes a grab-bag of assorted unrelated benefits.' *Id.* at Sec. 97.10.

. . . .

"Based on the foregoing, we conclude K.S.A. 1975 Supp. 44-510b(j) does not offend the equal protection guarantee. When the system of wage-loss protection is viewed as a whole, avoiding duplication or overlapping of benefits appears to be a reasonable legislative objective. It may be said that the classification created by the statute has a rational basis, is not arbitrary, and affords like treatment to persons similarly situated." 222 Kan. at 130-32. (Emphasis added.)

Justice Schroeder, joined by Justice Owsley, dissented in this opinion. Justice Schroeder was of the opinion that the statute unconstitutionally violated equal protection because it only reduced the workers compensation death benefits of those claimants who also received social security benefits and did not also reduce the workers compensation death benefits of those claimants who received private insurance monies, veteran's administration death benefits, or Kansas Public Employees Retirement System death benefits. Further, Justice Schroeder noted that the offset against workers compensation benefits for social security benefits reduces an employer's workers compensation payments and premiums, thereby discouraging an employer from adopting a safety program to prevent employee deaths in the future. Thus, Justice Schroeder was of the opinion that the offset statute singled out a class of persons for distinctive treatment without a rational basis, thereby violating equal protection. 222 Kan. at 137-38.

In *Boyd v. Barton Transfer & Storage, Inc.*, 2 Kan. App. 2d 425, 580 P.2d 1366, *rev. denied* 225 Kan. 843 (1978), the plaintiff, who was 62 years old and receiving social security benefits, was injured while working at his part-time job. The plaintiff worked at the part-time job to supplement his social security benefits. He was aware of how much money he could earn before becoming ineligible for social security, and he did not intend to exceed that amount. The plaintiff filed a workers compensation claim for his work-related injury, but he was denied benefits based on K.S.A. 1976 Supp. 44-510f(c) (since repealed), which provided:

"An employee shall not be entitled to compensation benefits for permanent total disability, temporary total disability or partial disability, under the workmen's compensation act, from and after the date when he shall be entitled to and during such period as he shall receive federal old age social security benefits, reduced or unreduced."

The Workers Compensation Director affirmed the denial of the benefits, and the plaintiff appealed to the district court, claiming that K.S.A. 1976 Supp. 44-510f(c) was unconstitutional. The district court held that the statute was constitutional and affirmed the denial of the benefits.

The Court of Appeals did not rule on the constitutionality of the statute. Instead, the court interpreted the offset statute and found that it did not apply to the plaintiff's workers compensation benefits. In so holding, the court stated:

"As we read K.S.A. 1976 Supp. 44-510f(c), an ambiguity exists as to whether it applies to those who like plaintiff are injured while employed in a part-time job after normal retirement and after they have started to receive social security old age benefits. We conclude that the legislature did not intend the statute to so apply and, therefore, reverse the denial of compensation.

" . . . .

" . . . As long as workmen's compensation is not viewed as a substitute for tort recovery but as wage-loss protection only, the cutoff of workmen's compensation at the time of retirement and initial receipt of old age social security benefits would be reasonable. The worker would suffer only one wage loss, but continued workmen's compensation after retirement would duplicate the wage-loss replacement of the old age social security benefits which begin at that time.

"On the other hand, workers such as the plaintiff here, who are already retired and receiving social security old age benefits before starting work on a part-time job to supplement those benefits, suffer a second wage loss when they are injured in the course of their employment. Should K.S.A. 1976 Supp. 44-510f(c) be applicable to such workers, it would totally preclude any replacement of the wages which they are entitled to earn over and above old age social security benefits. As such, it would not prevent 'duplication' but would operate to preclude the wage replacement which it was the intent of the legislature to provide through the Workmen's Compensation Act.

"It is a fundamental rule of statutory construction that the legislative intent behind a statute be ascertained wherever possible, and the legislative intent governs its construction even though the literal meaning of the words used therein is not followed. *State, ex rel., v. City of Overland Park*, 215 Kan. 700, 527 P.2d 1340 (1974). In determining legislative intent, courts are not limited to a mere consideration of the language used, but look to the historical background of the

enactment, the circumstances attending its passage, the purpose to be accomplished, and the effect the statute may have under the various constructions suggested. *Brown v. Keill*, 224 Kan. 195, 580 P.2d 867 (1978). When the interpretation of a section of an act according to the exact and literal import of its words would contravene the manifest purpose of the legislature, the entire act should be read according to its spirit and reason, disregarding so far as may be necessary the strict letter of the law. *State, ex rel., v. Kalb*, 218 Kan. 459, 543 P.2d 872 (1975), modified on other grounds, 219 Kan. 231, 546 P.2d 1406 (1976).

"From what has been said, we conclude that the legislature did not intend K.S.A. 1976 Supp. 44-510f(c) to apply to plaintiff and those similarly situated, even though the literal wording of that provision might seem to include them. It follows that plaintiff should not have been denied compensation under the act." 2 Kan. App. 2d at 426-29.

In *Brown v. Goodyear Tire & Rubber Co.*, 3 Kan. App. 2d 648, 599 P.2d 1031 (1979), *aff'd* 227 Kan. 645, 608 P.2d 1356 (1980), the claimant filed for and received an award for workers compensation from the Kansas Workers Compensation Fund. Sixteen months later, the claimant turned 65 years old and began receiving social security benefits. One month later, the Fund filed a motion for modification and termination of the claimant's workers compensation disability benefits, based on K.S.A. 1974 Supp. 44-510f(c) (since repealed), which provided:

"An employee shall not be entitled to compensation benefits for permanent total disability, temporary total disability or partial disability, under the workmen's compensation act, from and after the date when he shall be entitled to and during such period as he shall receive federal old age social security benefits, reduced or unreduced."

The workers compensation examiner granted the Fund's motion and terminated the claimant's disability benefits, stating that the Workers Compensation Fund would not be liable for further benefits to the claimant so long as he received social security benefits. The Workers Compensation Director sustained the termination order, and the district court affirmed the termination order. The plaintiff appealed the order to the Court of Appeals, alleging, *inter alia*, that K.S.A. 1974 Supp. 44-510f(c) unconstitutionally violated equal protection by creating a classification based on age and receipt of social security benefits. Relying on *Baker*, 222 Kan. 127,

the Court of Appeals upheld the constitutionality of K.S.A. 1974 Supp. 44-510f(c). In so holding, the court stated:

"The setoff provision challenged in this action withstands allegations of unconstitutionality on grounds similar to those described in *Baker*. When viewed as part of a wage-loss compensation program, the termination of benefits under 44-510f(c), like 44-510b(j), does not really penalize the injured worker. By preventing a duplication of benefits under the Workmen's Compensation Act and the Social Security Act, the provision places the worker in the same position as fellow workers who have retired and are drawing old age social security benefits. At that point he is no longer subject to wage loss. It is only his disability benefits that are affected. After retirement the wage loss experienced by a worker is not caused by injury, but by retirement. A worker could retain workmen's compensation benefits by staying in the labor market and not retiring. The setoff provision of 44-510f(c) does not apply to any medical compensation that might be owed under an award of compensation.

"The claimant argues that the purpose of the Workmen's Compensation Act 'is to burden the industry with the economic loss to a workman, or his dependents, resulting from accidental injury sustained by the workman arising out of and in the course of his employment,' *Hilyard v. Lohmann-Johnson Drilling Co.*, 168 Kan. 177, 180, 211 P.2d 89 (1949), and that the "arbitrary" classification under 44-510f(c) frustrates this statutory purpose by shifting the economic loss to the employee. However, as already discussed above, this contention is without merit.

. . . .

" . . . The wage-loss theory provides a reasonable basis for the offset, even if the social security benefits are lower than the workmen's compensation benefits, since the former amount is the same the worker would have received even if he had retired without having been injured. We therefore find that 44-510f(c) is constitutional." 3 Kan. App. 2d at 654-55.

This court affirmed the Court of Appeals' decision.

The plaintiffs acknowledge the case law which holds that similar pension offsets are constitutional. However, the plaintiffs ask this court to reconsider its decision in *Baker* and *Brown* and find the offset for social security retirement benefits in K.S.A. 44-501(h) to be an unconstitutional denial of equal protection for the reasons set out in the dissent by Justice Schroeder in *Baker*.

The analysis relied upon in *Baker* and *Brown* is still valid. Thus, based on *Baker* and *Brown*, the social security offset in K.S.A. 44-501(h) is rationally related to the valid state interest of preventing the duplication of wage loss replacement benefits. The pension offset does not unconstitutionally violate equal protection.

In the alternative, the plaintiffs ask this court to judicially limit the offset and find that it does not apply to employees who are injured while they are working on a job to supplement the social security benefits they were currently receiving, just as the Court of Appeals did in *Boyd*, 2 Kan. App. 2d 425. Moreover, the plaintiffs ask this court to find that the offset should not apply to employees injured before they received social security retirement benefits but who would have continued to work to supplement their social security benefits, once the time came, had it not been for their injuries. According to the plaintiffs, these workers are similarly situated to workers who were injured after receiving their first pension check and no rational basis exists for treating them differently. Finally, the plaintiffs point out that in both situations the social security retirement benefits do not replace the same wage loss replaced by the workers compensation benefits; thus, social security benefits should not be used to offset the workers compensation benefits. To do so, the plaintiffs claim, results in a violation of equal protection.

As· in *Boyd*, all of these questions deal more with the interpretation and application of the offset statute than with the constitutionality of the statute. The plaintiffs have only appealed the constitutionality of the statute; they have not appealed its specific interpretation or application. Thus, an analysis of these questions is best saved until a more appropriate time.

B. Private Pensions

K.S.A. 44-501(h) also allows an offset against workers compensation benefits, which an injured worker would otherwise be entitled to, for selected private pension retirement benefits, but only if the employer has contributed to the private pension, and even then no offset against the workers compensation benefits is allowed for the pension benefits attributable to an employee's contribution.

The plaintiffs claim that the private pension offset provision violates equal protection because it treats pension plans in which an employer has directly contributed funds different from all other retirement plans, without a rational basis. According to the plaintiffs, all private pension plans are actually paid for by employees

through years of labor. Thus, retired injured workers who receive private pensions are all similarly situated. Yet, they receive different amounts of workers compensation benefits depending on how much money, if any, their employer directly contributed to a private pension fund. The plaintiffs claim that no legitimate purpose is served by this disparate treatment of similarly situated injured employees which K.S.A. 44-501(h) requires. Thus, the plaintiffs assert that K.S.A. 44-501(h) violates equal protection. See *Stephenson v. Sugar Creek Packing*, 250 Kan. 768, 830 P.2d 41 (1992).

We hold the legislature intended to prevent duplication of wage loss replacement with the offset provision. The legislature concluded that it did not make sense to prevent duplication of replacement wages from social security benefits that were partially employer funded and not prevent such duplication of wages from employer-funded private pensions. Thus, the legislature allowed employer contributions in private pension plans, paid to retired injured workers, to offset employer-funded workers compensation benefits paid to the same injured workers, so as to prevent duplication of wage loss replacement. This is a public policy issue. The legislature believes such an offset will encourage employers to furnish retirement plans for employees because the employer will not be required to duplicate wage replacement should an injured worker retire. The prevention of wage loss duplication is a legitimate State goal, and the offset provisions for employer-funded retirement plans (social security or private pensions) are rationally related to this goal. K.S.A. 44-501(h) does not violate equal protection.

## IV. ATTORNEY FEES

Prior to 1993, the Act imposed a flat 25% limit on the contingency fee an injured worker could agree to pay a lawyer out of the benefits the worker might be awarded in a workers compensation action. This limitation specifically provided:

"With respect to any and all proceedings in connection with any initial or original claim for compensation, no claim of any attorney for services rendered in connection with the securing of compensation for an employee or the employee's dependents, whether secured by agreement, order, award or a judgment in any

court shall exceed a reasonable amount for such services or 25% of the amount of compensation recovered and paid, whichever is less, in addition to actual expenses incurred, and subject to the other provisions of this section. Except as hereinafter provided in this section, in death cases, total disability and partial disability cases, the amount of attorney fees shall not exceed 25% of the sum which would be due under the workers compensation act for 415 weeks of permanent total disability based upon the employee's average gross weekly wage prior to the date of the accident and subject to the maximum weekly benefits provided in K.S.A. 44-510c and amendments thereto." K.S.A. 1992 Supp. 44-536(a).

In 1993, the legislature amended this limitation on attorney fees in the Act. The amendment provided:

"With respect to any and all proceedings in connection with any initial or original claim for compensation, no claim of any attorney for services rendered in connection with the securing of compensation for an employee or the employee's dependents, whether secured by agreement, order, award or a judgment in any court shall exceed (1) a reasonable amount for such services or (2) the amount equal to the total of 25% of that portion of total compensation recovered and paid which is less than $10,001, 20% of that portion of total compensation recovered and paid which is greater than $10,000 and less than $20,001, and 15% of that portion of the total amount of the compensation recovered and paid which is in excess of $20,000, whichever is less, in addition to actual expenses incurred, and subject to the other provisions of this section. Except as hereinafter provided in this section, in death cases, total disability and partial disability cases, the amount of attorney fees shall not be based upon compensation which would be due under the workers compensation act beyond 415 weeks of permanent total disability based upon the employee's average gross weekly wage prior to the date of the accident and subject to the maximum weekly benefits provided in K.S.A. 44-510c and amendments thereto." K.S.A. 44-536(a).

The 1993 amendments made three significant changes to the rule allowing contingent attorney fees in workers compensation cases. The amendments imposed a graduated contingency fee rate, a limit on fees after a settlement offer, and a restriction against fees being paid out of vocational rehabilitation benefits. The 1997 Kansas Legislature amended the attorney fee rates again, returning them to their pre-1993 form, a flat 25% contingency fee limitation. Thus, the constitutionality of the 1993 attorney fee contingency rates is moot as to all future workers compensation claimants. The 1993 limit on fees after a settlement offer was also amended again in 1997. However, the 1997 amendments did not return the settlement attorney fee rates back to the pre-1993 status. Instead, the

1997 amendments created new settlement attorney fee rates. The constitutionality of the 1997 settlement fee amendments is not an issue in this case. The 1993 restriction against fees paid out of vocational rehabilitation benefits was not altered in 1997, and this 1993 amendment is still effective.

The 1997 amendments are substantive amendments which do not contain language indicating that the legislature intended for them to be applied retroactively. Hence, the 1997 workers compensation amendments are to be applied prospectively only. See *KPERS v. Reimer & Koger Assocs., Inc.*, 261 Kan. 17, 43, 927 P.2d 466 (1996) (" 'statute will operate prospectively rather than retrospectively unless its language clearly indicates that the legislature intended the latter.' ") (quoting *Eakes v. Hoffman-LaRoche, Inc.*, 220 Kan. 565, Syl. ¶ 1, 552 P.2d 998 [1976]).

The plaintiffs' challenge to the 1993 amendments focuses mainly on the graduated contingency fee rate. Since the 1997 attorney fee amendment has been enacted and applied prospectively, the only people who are affected by the 1993 contingency fee amendment are those workers compensation claimants who filed their claims between the date the 1993 amendment became effective, July 1, 1993, and the date the 1997 amendment became effective, July 1, 1997. The plaintiffs claim that this amendment, as applied to the narrow segment of claimants defined above, arbitrarily reduced the percentage of contingency fees which were allowed for representing injured workers, thereby violating equal protection and the separation of powers doctrine.

A. Separation of Powers

The plaintiffs argue that the regulation of the practice of law in Kansas, including the fees which attorneys may charge for their services, is a judicial, not a legislative function. Thus, according to the plaintiffs, when the legislature regulated contingency fees in workers compensation cases by enacting the 1993 amendments, the legislature was usurping the judicial power to regulate fees, thereby violating the separation of powers doctrine. The plaintiffs concede that the legislature has previously regulated attorney fees in the pre-1993 attorney fee statute, which set the contingency fee

limit at a flat 25% rate. However, the plaintiffs assert that this statute was not a true legislative regulation of attorney fees, but was simply a codification of a prior judicial rule setting the contingency fee rate at 25% in workers compensation cases.

Pointing to Model Rule of Professional Conduct (MRPC) 1.5 (1996 Kan. Ct. R. Annot. 276), the plaintiffs claim that this rule is the current judicial limit on contingency fees. The plaintiffs claim that to the extent the 1993 amendments conflict with MRPC 1.5 by imposing a graduated contingency fee rate, the 1993 amendments are unconstitutional as a violation of the court's inherent power to regulate the practice of law.

The plaintiffs claim that the graduated contingency fee agreement, which limits an attorney's percentage of recovery the greater the attorney's success, will induce an attorney to improperly curtail services for the client and receive a lesser award, as a larger award will not necessarily result in a higher attorney fee. Thus, the plaintiffs assert that the graduated contingency fee rates in the 1993 amendments conflict with the MRPC 1.5 and its Comment, thereby interfering with the court's power to regulate the practice of law and unconstitutionally violating the separation of powers doctrine.

The Comment to MRPC 1.5 provides:

"An agreement may not be made whose terms might induce the lawyer improperly to curtail services for the client or perform them in a way contrary to the client's interest. For example, a lawyer should not enter into an agreement whereby services are to be provided only up to a stated amount when it is foreseeable that more extensive services probably will be required, unless the situation is adequately explained to the client. *Otherwise, the client might have to bargain for further assistance in the midst of a proceeding or transaction.* However, it is proper to define the extent of services in light of the client's ability to pay. A lawyer should not exploit a fee arrangement based primarily on hourly charges by using wasteful procedures. When there is doubt whether a contingent fee is consistent with the client's best interest, the lawyer should offer the client alternative bases for the fee and explain their implications. *Applicable law may impose limitations on contingent fees, such as a ceiling on the percentage.*" (Emphasis added.)

MRPC 1.5 and this accompanying Comment were intended to prevent clients from having to bargain for further assistance in the

midst of a proceeding or transaction. This result will not happen when the graduated contingency fee rates are utilized. A lawyer does not receive any fee under a contingency fee agreement unless an award is recovered. As such, under a contingency fee agreement, a lawyer is induced to pursue a claim to its final outcome—an award or settlement. Utilizing a contingency fee payment plan, a client will not have to bargain for an attorney to pursue the claim to its final outcome in the midst of a proceeding or transaction. The lawyer will desire to do so; otherwise, he or she will not receive a fee at all. Since the rationale for the Rule and its Comment—to prevent clients from having to bargain for further assistance—will not be a problem with graduated contingency fee rates, then the Rule and the Comment—which prohibit fee agreements that induce an attorney to improperly curtail services—do not apply to or conflict with the graduated contingency fee rates in the 1993 amendments. The graduated contingency fee rates in the 1993 amendments do not interfere with the court's inherent power to regulate the practice of law or unconstitutionally violate the separation of powers doctrine.

In addition, MRPC 1.5 and its Comment specifically allow for statutory restrictions on contingent attorney fees. For instance, MRPC 1.5(f)(3) provides: "A lawyer shall not enter into an arrangement for, charge, or collect: . . . a contingent fee in any manner in which such fee is precluded by statute." Also, the Comment to MRPC 1.5 states in pertinent part: "Applicable law may impose limitations on contingent fees, such as a ceiling on the percentage." Any legislative regulation, *i.e.*, a statutory law, which regulates or limits contingency fee rates does not conflict, but is consistent, with the judicial regulation of attorney fees in the MRPC, which specifically allows for the statutory regulation of contingency fees.

## B. Equal Protection

The plaintiffs claim that the 1993 amendments changing the contingent fee rates for workers compensation cases, set out at K.S.A. 44-536(a), violate the Equal Protection Clauses of the Kansas and United States Constitutions.

Equal protection is implicated when a statute treats classes of people, who are "arguably indistinguishable," differently. *Smith v. Printup*, 254 Kan. 315, 321, 866 P.2d 985 (1993). The plaintiffs claim that K.S.A. 44-536(a) treats classes of people, who are "arguably indistinguishable," differently in two ways. First, the plaintiffs claim that the statute treats the class of workers who were injured or filed a workers compensation claim between July 1, 1993, and July 1, 1997, differently than the class of workers who were injured or filed a claim before July 1, 1993, or after July 1, 1997, even though these two classes of people are "arguably indistinguishable." This is not a valid equal protection argument. When a new statute is amended, it will always treat those citizens who are affected by the statute before the effective date of the amendment differently than it will treat those citizens who are affected by the statute after the effective date of the amendment. If such different treatment implicates equal protection concerns, then every amendment ever enacted will be subject to an equal protection challenge. This is not reasonable or valid. Instead, equal protection concerns are only implicated when a statute, evaluated independently and without regard to previous versions of the statute, treats two classes of people differently, even though the classes are arguably indistinguishable.

The plaintiffs also claim that K.S.A. 44-536(a), evaluated independently, violates equal protection because it treats two classes of people differently—the injured worker class in a workers compensation case and the employers and insurance company class in a workers compensation case—even though the two classes are arguably indistinguishable. The plaintiffs point out that K.S.A. 44-536(a) only applies the new graduated contingency fee rates to attorneys hired by an injured employee or by the employee's dependents in a workers compensation case. The new rates do not apply to or restrict the payment of an attorney hired by an employer or an employer's insurance company in a workers compensation case. According to the plaintiffs, the reduced attorney fee rates make it more difficult for an injured employee to secure a competent, aggressive attorney to represent the employee in a workers compensation case. Since the reduced rates do not apply to em-

ployers or their attorneys, the plaintiffs argue that an employer will not have a difficult time in securing a competent attorney to defend the employer in a workers compensation action. Thus, the plaintiffs claim that K.S.A. 44-536(a) treats the class of injured employees in a workers compensation case differently and disparately than it treats the class of employers in a workers compensation case, even though the two classes are arguably indistinguishable. As such, the plaintiffs assert that K.S.A 44-536(a) implicates equal protection.

K.S.A. 44-536(a) states in pertinent part:

"(a) With respect to any and all proceedings in connection with any initial or original *claim for compensation*, no claim of *any attorney for services rendered in connection with the securing of compensation for an employee or the employee's dependents*, whether secured by agreement, order, award or a judgment in any court shall exceed (1) a reasonable amount for such services or (2) [the graduated contingency fee rates], whichever is less, in addition to actual expenses incurred, and subject to the other provisions of this section." (Emphasis added.)

K.S.A. 44-536(a) clearly treats the class of injured workers in workers compensation cases differently that it treats the class of employers in workers compensation cases—by applying the graduated contingency fee rates only to lawyers hired by employees and not to lawyers hired by employers. Thus, the question to ask is whether these two classes of people, who are treated differently by the statute, are arguably indistinguishable.

Clearly, these two classes of people are not arguably indistinguishable. We are dealing with apples and oranges. Employers are not able to win an award in defense of a workers compensation case. There is no recovery of a sum of money at the end of a case from which an employer could pay out a contingent fee. Employees, on the other hand, often do not have the money to pay an attorney by the hour to pursue a workers compensation claim. Should the attorney win the case, the employee will be awarded a sum of money at the end of the proceedings, out of which the employee could pay the attorney. Thus, employees almost always compensate the attorneys they hire to represent them in a workers compensation case on a contingent fee basis. In this way, the two classes of people are not indistinguishable—one class compensates attorneys on a contingent fee basis and one class compensates at-

torneys on an hourly basis. Thus, K.S.A. 44-536(a) does not implicate equal protection because it does not treat two arguably indistinguishable classes differently.

In any event, the United States Supreme Court considered an analogous issue in *Department of Labor v. Triplett*, 494 U.S. 715, 108 L. Ed. 2d 701, 110 S. Ct. 1428 (1990).

*Triplett* involved a due process challenge of the Black Lung Benefits Act, which required that the fees for an attorney representing a benefits claimant under the Act be approved by the Department of Labor as "reasonable." The respondent, George Triplett, violated the attorney fee restrictions by receiving a 25% contingency fee before it had been approved as reasonable. Triplett argued the attorney fee restrictions in the Act violated the due process rights of Black Lung Benefits Act claimants because it deprived such claimants of available attorneys to represent them in pursuing benefits. According to Triplett, no attorneys were willing to represent claimants under the current Black Lung Benefits Act attorney fee restrictions. The Supreme Court found this assertion to be unsupported by evidence. In so ruling, the Court stated:

"Here, we need not reach the [attorney availability] issue unless respondent has proved what was assumed in [*Walters v. National Assn. of Radiation Survivors*, 473 U.S. 305, 87 L. Ed. 2d 220, 105 S. Ct. 3180 (1985),] viz., that the regime made attorneys unavailable to his prospective clients at the time respondent violated the Act. That showing contains two component parts: (1) that claimants could not obtain representation, and (2) that this unavailability of attorneys was attributable to the Government's fee regime. That is no small burden, and respondent has failed to bear it.

" . . . The 'factual record' upon which the [trial] court relied to invalidate this federal program consisted of testimony by two lawyers in the disciplinary proceeding, five affidavits attached to an *amicus* brief to the court, and statements by attorneys in hearings before a House of Representatives Subcommittee in 1985. Since it is critical to our disposition of the case, we shall describe the evidence the court relied upon in some detail.

"As to the first issue—unavailability of attorneys—the court relied upon three lawyers' assessments. One stated that 'fewer qualified attorneys are accepting black lung claims,' and that more claimants are proceeding *pro se*. 180 W. Va., at 541, 378 S.E.2d, at 90. According to a second attorney, 'few attorneys are willing to represent black lung claimants.' *Ibid*. A third lawyer's evaluation was not contained in the record, but consisted of his 1985 testimony to the House subcom-

mittee that 'many of his colleagues had ". . . stated unequivocally that they would not take black lung cases . . . ." ' *Id.*, at 542, 378 S.E.2d, at 91 (quoting Hearings on Investigation of Backlog in Black Lung Cases before the Subcommittee on Labor Relations of the House Committee on Education and Labor, 99th Cong., 1st Sess., 188 [1985]). (The court did not mention the testimony of other witnesses before the Subcommittee to the opposite effect. See, *e.g.*, *id.*, at 45.)

"This will not do. We made clear in *Walters* that this sort of anecdotal evidence will not overcome the presumption of regularity and constitutionality to which a program established by Congress is entitled. 473 U.S., at 324, n.11. The impressions of three lawyers that the current system has produced 'few' lawyers, or 'fewer qualified attorneys' (whatever that means), and that 'many' have left the field, are blatantly insufficient to meet respondent's burden of proof, even if entirely unrebutted." 494 U.S. at 722-23.

The plaintiffs try to distinguish *Triplett* by claiming that only two affidavits were submitted in *Triplett* and that these affidavits did not indicate individual claimants were going unrepresented. Here, the plaintiffs claim, the evidence in *Triplett* is well exceeded by seven affidavits which establish that many attorneys have reduced their workers compensation practice and that many claimants are going unrepresented. However, the plaintiffs are mistaken about the amount of evidence considered in the *Triplett* case. The *Triplett* court actually considered the testimony of two lawyers, five affidavits attached to an *amicus* brief, and the testimony of an attorney before a House of Representatives subcommittee meeting. This amount of evidence is comparable to the amount of evidence presented herein. The United States Supreme Court found that the amount of evidence presented in *Triplett* was insufficient to prove that the attorney fee restrictions in the Act would prevent claimants from being able to secure competent representation, even though the evidence presented was unrebutted.

Here, the defendants presented the affidavit of Philip Harness, the Director of the Division of Workers Compensation. Harness stated that since the effective date of the 1993 amendments, "the Division [of Workers Compensation] has not received one complaint from an injured worker that he or she was unable to obtain legal counsel as a result of changes made to the workers compensation laws." Thus, the defendants assert there is not sufficient

evidence to prove that K.S.A. 44-536(a) will prevent injured workers from being able to secure competent representation. We hold that K.S.A. 44-536(a) does not treat employees disparately and thus does not implicate equal protection.

### C. Due Process

The plaintiffs contend that K.S.A. 44-536 unconstitutionally violates the Due Process Clauses of the United States and Kansas Constitutions. The plaintiffs claim that their due process rights have been violated because their remedy for injuries suffered on the job, a workers compensation award, is now more difficult to achieve.

Even assuming that the plaintiffs' remedy is more difficult to achieve because competent attorneys are less likely to take workers compensation cases with reduced attorney fees, K.S.A. 44-536(a) does not violate due process. The two-step test which is used to analyze a potential due process violation is set out in *Lemuz v. Fieser*, 261 Kan. 936, 946-47, 933 P.2d 134 (1997).

Step 1 of the due process test is similar to the rational basis standard of an equal protection analysis. "In referring to an analysis under Step 1 of the § 18 test, the *Bonin* court stated that ' "[t]he test in determining the constitutionality of a statute under due process or equal protection weighs almost identical factors." ' *Bonin*, 261 Kan. at 218 (quoting *Clements v. United States Fidelity & Guaranty Co.*, 243 Kan. 124, 127, 753 P.2d 1274 [1988])." *Lemuz*, 261 Kan. at 948. The State has a legitimate interest in protecting the interest of employees by allowing them to keep more of their workers compensation award. Further, graduated contingency fee rates are rationally related to this valid legislative objective. In other words, the graduated contingency fee rates are a legislative means which have a real and substantial relation to the objective sought—protecting the interests of employees by allowing them to keep more of their workers compensation award. Thus, graduated contingency fee rates satisfy Step 1 of the due process test.

Under Step 2 of the due process test, the question is not whether the legislature provided an adequate substitute remedy for taking

away the higher attorney fee rates in the Act. Instead, the question becomes whether the Act, with its reduced attorney fee rates, presumably causing the reduced availability and quality of workers compensation attorneys, has made it so difficult to receive a workers compensation award that the Act is no longer an adequate substitute remedy for the abrogation of the employees' right to sue employers for negligence. If so, then the limits on contingency fee rates, making the quid pro quo inadequate, violate due process. This question will be discussed under issue V.

## V. ADEQUATE QUID PRO QUO

The plaintiffs claim that their due process rights have been violated because their remedy in a workers compensation action has been limited due to a more stringent notice of claim statute, a limitation in the recovery available for shoulder injuries, and various other limitations set forth above that were placed on workers compensation recovery. In analyzing a potential due process violation, the following test should be utilized:

" 'If a remedy protected by due process is abrogated or restricted by the legislature, "such change is constitutional if '[1] the change is reasonably necessary in the public interest to promote the general welfare of the people of the state,' *Manzanares v. Bell*, 214 Kan. 589, 599, 522 P.2d 1291 (1974), and [2] the legislature provides an adequate substitute remedy" to replace the remedy which has been restricted.' *Bonin v. Vannaman*, 261 Kan. 199, 217, 929 P.2d 754 (1996) (citing *Aves v. Shah*, 258 Kan. 506, 521, 906 P.2d 642 [1995])." *Lemuz*, 261 Kan. at 946-47.

As previously set forth in this opinion, Step 1 of the due process test in *Lemuz* is satisfied.

In applying Step 2 of the due process test, it is important to realize that the workers compensation remedy is not a common-law remedy. Rather, it is an adequate, substitute remedy itself (or quid pro quo) for the abrogation of a plaintiff's right to sue an employer for an injury incurred on the job due to the employer's negligence. In 1911, the legislature stripped employees of their common-law right to bring a civil action against employers for injuries caused by employers' negligence. "The legislature can modify the common law so long as it provides an adequate substitute

remedy for the right infringed or abolished." *Kansas Malpractice Victims Coalition v. Bell*, 243 Kan. 333, 350, 757 P.2d 251 (1988). Thus, when the legislature abolished the employees' common-law right to sue employers for injuries, the legislature provided employees with an adequate substitute remedy—the Workers Compensation Act. The Act allowed employees to quickly receive a set but possibly smaller sum of money for injuries received at work, regardless of whether the injuries were the result of the employer's negligence. This made the Act an adequate substitute remedy for the abrogation of the employees' common-law right to sue an employer for negligence. *Shade v. Cement Co.*, 92 Kan. 146, 139 Pac. 1193, *aff'd on rehearing* 93 Kan. 257, 144 Pac. 249 (1914).

Now, the legislature has made the Act's notice of claim statute more strict, making it more difficult than it was prior to the 1993 amendments for injured employees to timely notify an employer of an injury so the worker can recover compensation. The legislature has also classified shoulder injuries as scheduled injuries, which typically means that those employees who suffer a shoulder injury under the new Act will receive less compensation than they would have under the pre-1993 Act. The legislature also allowed workers compensation benefits to be offset by the amount of money an injured employee receives in retirement benefits from social security or from a private pension plan funded by the employer. Further, the legislature enacted various other amendments to the Act which make it more difficult than it was prior to 1993 for an injured worker to receive workers compensation benefits. For instance, the legislature disallowed recovery for the aggravation of a preexisting injury even though the aggravation of the injury was due to a work-related activity. The 1993 amendments repealed an employee's right to vocational rehabilitation, allowing an employer to provide vocational rehabilitation only if the employer chose to do so. The legislature limited the healing period for scheduled injuries only to cases involving amputations. The reform bill placed a cap on the top wage rate an employee can be compensated at ($450 per week), regardless of an employee's actual earnings, and placed a cap on the amount of compensation an employee can receive for functional impairment ($50,000), regard-

less of the severity of the employee's impairment. Finally, the legislation made conclusive the prior presumption against work disability when an employee earns a comparable wage. L. 1993, ch. 286.

These changes in the Act indicate that the quid pro quo for the abrogation of the employees' common-law right to sue an employer for negligence is less than what it was prior to 1993. The plaintiffs claim that the quid pro quo is so much less that it is no longer an adequate substitute remedy for the abrogation of their right to sue an employer for negligence. Thus, the plaintiffs claim that the Act, or at least portions of it—the portions which dilute the quid pro quo, are an unconstitutional violation of due process.

*Bair v. Peck*, 248 Kan. 824, 844, 811 P.2d 1176 (1991), was the first case to express that an originally adequate quid pro quo for the abrogation of a common-law right might become so cut down and diluted that it would no longer be adequate to support the abrogation of the common-law right and would thus violate due process. In analyzing this issue, *Bair* identified a test to use in order to determine whether the legislature has altered the original statutory replacement to such an extent to make it unconstitutional. In *Bair*, this court stated:

"[W]e are directly faced with a determination of whether the comprehensive remedy of mandatory insurance and excess coverage from the [Health Care Stabilization] Fund, provided by the original [Health Care Insurance Availability] Act, is a sufficient quid pro quo for this subsequent amendment or modification of the Act.

"We have long recognized, at least tacitly, that major statutory enactments establishing a broad, comprehensive statutory remedy or scheme of reparation in derogation of a previously existing common-law remedy may be subsequently amended or altered without each such subsequent change being supported by an independent and separate quid pro quo. Provisions of the original Workmen's Compensation Act adopted in 1911 and upheld as constitutional in *Shade v. Cement Co.*, 92 Kan. 146, 139 Pac. 1193, *aff'd on rehearing* 93 Kan. 257, 144 Pac. 249 (1914), have been repeatedly amended without the adoption of an additional quid pro quo each time an amendment operated to the detriment of the employee. The original quid pro quo providing recovery for injury regardless of fault or negligence has been deemed sufficient to support dozens of amendments to the original act, many of which involved the abrogation of an existing common-law right.

"In *Rajala v. Doresky*, 233 Kan. 440, 661 P.2d 1251 (1983), the court, in a unanimous opinion, found that the Kansas Workmen's Compensation Act, in providing immunity to fellow employees when compensation is recoverable under the Act, did not violate Section 18. In doing so, the court expressly stated that it did not 'view as significant' the fact that fellow employee immunity was not enacted until 1967. 'The Workmen's Compensation Act removes certain common law remedies for injured employees but provides a statutory substitute therefor.' 233 Kan. at 441. While not specifically stated, the court obviously held that the 1967 amendment, which provided fellow employee immunity, did not require a new quid pro quo because the comprehensive remedy afforded by the Workmen's Compensation Act, already in existence, was sufficient.

. . . .

"In considering the adequacy of the quid pro quo of comprehensive legislation, which substitutes a statutory remedy for one that formerly existed at common law, and its sufficiency to support subsequent amendments or modifications which diminish the substitute remedy originally granted, no hard and fast rule can apply to all cases. It is obvious that the needs and goals of comprehensive legislation such as the Workers Compensation Act, the Kansas Automobile Injury Reparations Act and the Health Care Provider Insurance Availability Act will change with the passage of time and the needs of a fluctuating society. It would take the wisdom of Solomon to devise comprehensive remedial legislation, such as that now before us, which would never need fine tuning, change, or modification. The Act is a piece of ongoing legislation which will, of necessity, require continuous modification to accomplish its goals.

. . . .

"At the time of the malpractice alleged by the plaintiff in this case, each individual health care provider who was alleged to be negligent was required to maintain $200,000 malpractice coverage and, in addition, the Fund provided $3,000,000 excess coverage for each tortfeasor. Without the Act, there would be no guarantee that a plaintiff injured because of the negligence of a health care provider could ever recover for his injuries, let alone have an assured fund available of $3,200,000. That is a sizeable quid pro quo, established by the Act, and certainly is an adequate substitute remedy for the common-law rights given up by injured malpractice victims. No argument is made that if the elimination of the employer's vicarious liability had been a part of the original Act, the quid pro quo would somehow be insufficient. We conclude that in reviewing the sufficiency of the substitute remedy as it applies to amendment or modification of comprehensive remedial legislation, each determination must be made on a case-by-case basis. *Recognizing that all such legislation may need periodic modification, we think the proper test to apply is whether the substitute remedy would have been sufficient if the modification had been a part of the original Act.* If so, then no new or additional quid pro quo is necessary to support the modification against a Section 18 attack. Any other holding would require that every modification of a substitute remedy provided by comprehensive legislation that originally abrogated

a common-law remedy would require a new and additional substitute remedy. As already noted, it would be virtually impossible to draft such legislation in a form that would anticipate all contingencies and which would not thereafter need change and modification.

*"We recognize that there is a limit which the legislature may not exceed in altering the statutory remedy previously provided when a common-law remedy was statutorily abolished. The legislature, once having established a substitute remedy, cannot constitutionally proceed to emasculate the remedy, by amendments, to a point where it is no longer a viable and sufficient substitute remedy.* K.S.A. 1990 Supp. 40-3403(h) does not amend the Act to such a degree that the substitute remedy is no longer sufficient and we hold that the statute is not unconstitutional under Section 18 of the Kansas Bill of Rights." (Emphasis added.) 248 Kan. at 841-44.

Relying on the *Bair* test, the plaintiffs contend that the substitute remedy for the abrogation of an employee's common-law right to sue an employer for negligence—the Act—would not have been a sufficient quid pro quo when the common-law right was originally abrogated if the current amendments at issue had been a part of the original Act. The plaintiffs concede that the legislature provided an adequate substitute remedy for the abrogation of an employee's common-law right to sue an employer for negligence— the original Act. However, once having established this substitute remedy (the Act), the plaintiffs claim that the legislature has proceeded to emasculate the remedy (the Act), by amendments, to a point where it is no longer a viable and sufficient substitute remedy. Thus, the plaintiffs assert that the Act, or the certain amendments which emasculate the adequacy of the remedy as a quid pro quo, violate due process under Section 18 of the Kansas Constitution Bill of Rights.

In support of their contention that the adequate substitute remedy of the original Act has been emasculated by amendments, the plaintiffs point out that the Act no longer provides a speedy remedy. Litigants may wait months for a final award to be issued. According to the plaintiffs, requests for review of an award by the Workers Compensation Board may take months to be scheduled for argument, and many more months waiting decision. Further, the plaintiffs contend that a workers compensation proceeding is no longer an inexpensive undertaking. Expert witnesses are usually

necessary, and unauthorized medical benefits may no longer by used by the injured worker to obtain an independent disability evaluation.

The plaintiffs concede that this court has approved previous amendments to the Act. See *Rajala v. Doresky*, 233 Kan. 440, 661 P.2d 1251 (1983). However, the plaintiffs contend that none of those changes were of the cumulative magnitude of the 1993 amendments. According to the plaintiffs, it is one thing for the legislature to make relatively minor adjustments to one or two sections of the Act, but it is an entirely different matter when the legislature makes major changes designed to reduce or eliminate compensation for workers.

*Lemuz v. Fieser*, 261 Kan. 936, sheds further light on this issue. In *Lemuz*, the question was whether the Health Care Provider Insurance Availability Act and the Health Care Stabilization Plan, which were considered adequate substitute remedies or quid pro quos for the abrogation of some of the plaintiff's common-law rights in 1976, were still considered adequate remedies for the continued abrogation of those same rights, in light of amendments the Act and the Fund had undergone in 1989 which reduced the statutory benefits available to the plaintiff. This court held that the Act and the Fund were both still adequate substitute remedies for the abrogation of the plaintiffs' common-law rights despite any amendments the Act and the Fund had undergone. 261 Kan. at 950-58. In so holding, this court stated:

"In summary, this court struggles with the bottom line figure as to how much a quid pro quo can be amended and still remain an adequate quid pro quo. As in *Bair*, 248 Kan. at 844, this court realizes that an original quid pro quo cannot be emasculated to a point where it is no longer a viable and sufficient substitute remedy. Here, the legislature did *not* emasculate the quid pro quo provided in the Act, the Plan, and the Fund, through the 1989 amendments, to a point where it was no longer an adequate substitute remedy . . . . Under the amended Fund, the minimum amount of medical malpractice insurance the doctor is now required to carry is $300,000. If they can prove negligence, the plaintiffs will recover at least $300,000. Without the Act and the Fund, the doctor might not have been insured at all and the plaintiffs might have recovered nothing. In a medical malpractice case, the doctor has his or her personal fortune at stake if adequate insurance is not purchased. It is basically the doctor who has little to risk who carries the minimum insurance. The public is benefitted by any insurance that is

carried by that doctor. *This is, and should be to some extent, a legislative call* and we are unable to say that requiring $300,000 minimum to be available in every case is so inadequate that it is an inadequate quid pro quo. The plaintiffs herein will personally receive the benefit of the portion of the original quid pro quo that remains—required primary medical malpractice insurance and guaranteed excess medical malpractice insurance. . . . Thus, the legislature has provided an adequate quid pro quo for the statutory abrogation of the plaintiffs' common-law remedy to sue a hospital for corporate negligence." 261 Kan. at 959-60. (Emphasis added.)

Here, S.B. 307 passed unanimously in both the Kansas House and the Kansas Senate, and Governor Finney signed the bill. At the start of the 1993 session, legislators had before them the reports of the Governor's Task Force on Workers Compensation, the Insurance Commissioner's Workers Compensation Task Force, and the Legislative Post Audit Committee, all of which suggested areas of the workers compensation system which needed reform. Before passing the bill, the House Committee on Labor and Industry and the Senate Committee on Commerce conducted many hearings and heard from many witnesses representing employees, employers, trial lawyers, labor organizations, and business associations. The bill was the product of a comprehensive reform effort that attempted to balance the interests of employees, employers, labor, and business organizations.

The amended Act still provides compensation for injured workers without proof of negligence or fault, a benefit not allowed under typical tort law. While several of the amendments at issue do restrict an employee's right to receive workers compensation benefits, several other amendments have also been enacted with the intent to expand an employee's rights. (However, the expansion pales in comparison to what was taken away.)

With these rights still available to injured workers under the amended Act, it cannot be said that the Act, which originally provided an adequate substitute remedy for the abrogation of an employee's common-law right to sue an employer for negligence, has been emasculated to the point where it is no longer an adequate quid pro quo. Neither the Act as a whole nor the individual 1993 amendments violate due process.

Affirmed.

ALLEGRUCCI, J., dissenting: I disagree with the majority's conclusion that the Act as amended continues to be an adequate substitute remedy. The legislature responds to a so-called "crisis" by restricting or reducing the right of an injured citizen to a remedy by due course of law. However, as noted by the majority, when the legislature provides a substitute remedy, its authority to subsequently alter that remedy is not unlimited. The legislature cannot alter the remedy to the point "it is no longer a viable and sufficient substitute remedy." *Bair v. Peck*, 248 Kan. 824, Syl. ¶ 16, 811 P.2d 1176 (1991). As in the amendments to the Health Care Provider Insurance Availability Act at issue in *Bair*, I am unable to determine at what point, if any, the majority would conclude the legislature went too far in altering a substitute remedy. I would conclude that the Workers Compensation Act, as amended, no longer provides an adequate quid pro quo. I therefore dissent.