NOT DESIGNATED FOR PUBLICATION

No. 117,342

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

CHARLES W. HAMILTON,
*Appellant*,

v.

WALMART and NEW HAMPSHIRE INSURANCE CO.,
*Appellees*.

MEMORANDUM OPINION

Appeal from Workers Compensation Board. Opinion filed March 2, 2018. Affirmed.

*William L. Phalen*, of Pittsburg, for appellant.

*Ryan D. Weltz* and *Michael R. Kauphusman*, of Wallace, Saunders, Austin, Brown & Enochs, Chartered, of Overland Park, for appellees.

Before POWELL, P.J., STANDRIDGE, J., and STUTZMAN, S.J.

PER CURIAM:  Charles Hamilton was working part-time at Walmart when he was injured moving a box of computer paper. The Workers Compensation Appeals Board (Board) found Hamilton was permanently and totally disabled as a result of the injury but also found the amount of the benefits for his permanent total disability must be offset by the amount of his social security benefits. Hamilton appeals, challenging the constitutionality of K.S.A. 2017 Supp. 44-501(f), the section of the Workers Compensation Act (Act) requiring the offset of his social security benefits. Walmart filed a cross-appeal, claiming error in the Board's decision that Hamilton was permanently and

1

totally disabled by the work injury. On the basis explained below, we reject both appeals and affirm the decision of the Board.

FACTS AND PROCEDURAL BACKGROUND

Hamilton began working at the Walmart store in Baxter Springs in 1998. At the time of his injury in February 2013 Hamilton was 67 years old, working part-time as an assembler, putting together bicycles, furniture, and other items. Hamilton had begun drawing social security retirement benefits when he was 62 and continued to work part-time to supplement those benefits.

Hamilton testified that on February 18, 2013, he was carrying a box of computer paper that weighed 30 to 40 pounds. As he twisted to place the paper by a cabinet in a narrow hallway, he felt a pop. After that, he began experiencing lower back pain, pain that radiated down his right leg, and foot drop. Hamilton reported the accident to store management and was sent to see Dr. Estep at Freeman Occupational Health. Estep ordered an MRI, gave Hamilton medication, and prescribed physical therapy. Estep also imposed work restrictions, including use of a cane at work and lifting no more than 10 pounds. Walmart provided work within those restrictions, including sweeping, cleaning, and painting.

When Hamilton's injury did not improve, Estep ordered an EMG, which disclosed an L5 radiculopathy. Hamilton eventually met with a surgeon, Dr. Sweeney, who recommended a fusion from the L3 to L5 vertebrae. Walmart then sent him to Dr. John Ciccarelli, a board certified orthopedic spine surgeon, for a second opinion. Ciccarelli determined Hamilton had a disk herniation at his L3-L4 vertebrae, and recommended treatment of the disk herniation rather than fusion surgery. On April 30, 2014, Ciccarelli performed decompression surgery on Hamilton's L3-L4 vertebrae.

Three weeks post-surgery, Ciccarelli noted Hamilton reported his low back pain and lower extremity symptoms had improved markedly. Ciccarelli kept Hamilton off work for three more weeks, after which he released him to work with the following restrictions: no repetitive bending or lifting below the waist; alternate sitting and standing each hour as needed; and no loads greater than 10 pounds. From their last visit on August 5, 2014, Ciccarelli recorded that Hamilton was continuing to recover well from the surgery. Hamilton reported his ankle still felt weak, but Ciccarelli did not see any signs of foot drop. He found Hamilton was at maximum medical improvement and released him to work without any restrictions.

Just over a month after the release to work, on September 12, 2014, Hamilton resigned from Walmart. In a resignation letter he stated he felt he could not do his job properly, did not feel the surgery had helped, and was worried about reinjury. During his last month with the company he did nothing more than sweep or clean at the direction of the manager, even though he no longer had work restrictions. Hamilton filed a claim against Walmart under the Act, arguing he was permanently and totally disabled by the February 2013 injury and the social security offset in the Act is unconstitutional on equal protection grounds.

At the time of the hearing on his claim, Hamilton was 70 years old. He graduated from high school in 1965, then served in the Navy for four years. During the 1970s, he completed certificates in auto mechanics, air conditioning, and welding, but never worked in any of those fields. He had back surgeries in 1975 and 1988 and reported a complete recovery from both.

Hamilton testified his leg gave out a couple times a day, he had constant lower back pain, and foot drop prevented him from walking long distances. He stated he had difficulty sitting or standing for long periods of time and had to lie down every half hour

3

throughout the day to relieve the pain. He also said he had difficulty sleeping, which affected his ability to concentrate.

Dr. Brent Koprivica, a board certified occupational medicine physician, performed a physical evaluation of Hamilton on March 14, 2015, at the request of Hamilton's attorney. Koprivica had prior medical records for Hamilton, including Ciccarelli's records. Hamilton reported ongoing constant back pain to Koprivica, saying the surgery did improve his pain but the pain levels remained relatively high and he had foot drop with weakness. He stated he could sit or stand for less than three hours at a time and his walking was limited to less than an hour. He also self-limited his lifting and carrying to less than 10 pounds.

Koprivica diagnosed Hamilton with an acute L3-L4 disk herniation, for which Hamilton underwent bilateral lateral recess decompressions with discectomy at L3-L4. In Koprivica's opinion, Hamilton's work injury was the prevailing factor causing his injury and any resulting impairment, and the injury required past and future medical treatment. Koprivica determined Hamilton's impairment was 25 percent to the whole person, of which 10 percent preceded this incident, leaving a 15 percent whole body impairment from this injury.

Koprivica recommended the following restrictions for Hamilton: limit lifting or carrying to 10 pounds on an occasional basis; avoid sustained or awkward postures of the low back; avoid frequent or constant squatting, crawling, kneeling, or climbing; have the ability to change between sitting, standing, and walking after two hour intervals, with the flexibility to change more frequently if necessary for pain; and avoid whole body vibration exposure or jarring, as experienced with driving or operating heavy equipment.

In addition, Koprivica reviewed the vocational report prepared by Karen Terrill, a rehabilitation consultant, and concluded Hamilton could not return to any past relevant

work given the restrictions resulting from this injury. In Koprivica's opinion, Hamilton was permanently and totally disabled as a result of this injury.

Terrill spoke with Hamilton on August 18, 2015, at the request of Hamilton's attorney. Based on their discussion, Terrill compiled a list of five tasks Hamilton had performed in the past five years while working for Walmart. Based on Koprivica's restrictions, Terrill determined Hamilton had experienced a 100 percent task loss and could not return to any of his past relevant work. Terrill also believed Hamilton had no transferable skills that would enable him to find work he had not previously performed. Hamilton's training in auto mechanics, air conditioning, and welding was now outdated and, because he was an older worker, he would have difficulty acquiring new skills. Terrill determined Hamilton could not perform any jobs in the unskilled labor market due to his age, education level, and Koprivica's restrictions. In her opinion, Hamilton was now permanently and totally disabled because of this work injury, although she stated there were some jobs Hamilton could perform within Dr. Vito Carabetta's restrictions, such as secretarial or customer service work.

Dr. Carabetta performed a court-ordered independent medical examination of Hamilton. Hamilton told Carabetta his main issue was low back pain on his right side, which he described as constant and varying in intensity. He said the pain radiated into his right buttock and thigh for episodes of five minutes each, two to three times per week, and he also had a foot drop on his right side. Hamilton stated his symptoms worsened when climbing a ladder, sitting longer than an hour, standing more than two hours, bending forward, or lifting.

In Carabetta's opinion, Hamilton had a 10 percent whole person impairment prior to the February 18, 2013, incident. He did not feel Hamilton had suffered any loss of motion segment integrity and Hamilton's DRE category of assessment had not changed,

5

so he did not experience a net rating change. Carabetta noted, however, that Hamilton had weakness in the distribution of the fourth lumbar nerve on his right side, creating a foot drop. Carabetta considered this a distinct change attributable to Hamilton's work injury. He assigned Hamilton a five percent whole person impairment and also advised that Hamilton should not lift more than 25 pounds at a time, should limit his frequent lifting to 10 pounds, and should only occasionally bend or stoop.

Ciccarelli assigned a 10 percent impairment to Hamilton due to the radiculopathy and the surgery. He stated he did not believe Hamilton had any task loss based on their last meeting, but he admitted he had not had an opportunity to examine Hamilton since August 5, 2014, so he was unable to assess Hamilton's current physical restrictions. He stated the physicians who had seen Hamilton since August 2014 would be in a better position to determine his physical restrictions.

Vocational rehabilitation counselor Michelle Sprecker met with Hamilton at Walmart's request. Based on her interview, she identified 18 tasks Hamilton had performed in the five years preceding his accident and, with Ciccarelli's restrictions, she considered Hamilton was able to return to his preinjury job without any wage loss. Under Carabetta's or Koprivica's restrictions, however, Sprecker determined Hamilton would not be able to return to his former job at Walmart.

In Specker's opinion, Hamilton was able to reenter the job market and earn approximately $352.33 per week. She believed Hamilton had a number of transferable job skills, including the ability to provide customer service, the ability to work in a safe manner, and the ability to show up to work on time. Sprecker listed fast food worker, retail salesperson, telemarketer, security guard, and surveillance monitor as positions Hamilton could possibly work. She noted, however, that Hamilton had not worked any of those positions in the previous 15 years, so he would need on-the-job training.

6

Considering that evidence, the Administrative Law Judge (ALJ) found that Hamilton met with personal injury arising out of and in the course of his employment with Walmart, resulting in a 12.5 percent functional impairment to his body as a whole. The ALJ concluded, however, that Hamilton was not entitled to work disability or permanent total disability compensation because he left his position with Walmart voluntarily. The ALJ also found Hamilton's temporary total disability was subject to a social security retirement benefit offset and awarded Hamilton his future medical costs.

On appeal, the Board affirmed the finding that Hamilton had sustained a 12.5 percent functional impairment as a result of his accident. Contrary to the ALJ, however, the Board found Hamilton's injury forced him to leave his job at Walmart, he had lost the ability to obtain work in the open labor market, and he was permanently and totally disabled.

The Board awarded Hamilton 6.71 weeks of temporary total disability compensation at the rate $235.93 per week, 51.88 weeks of permanent partial disability at the rate of $235.93 per week to be paid in a lump sum of $12,240.05, and permanent total disability at the rate of $235.93 per week until Hamilton received a total award not exceeding $155,000. The Board found, however, that Hamilton's temporary total disability and permanent total disability were subject to an offset of $302.54 due to Hamilton's social security retirement benefits. Therefore, Walmart did not owe any amount other than Hamilton's award of functional impairment. The Board also affirmed the ALJ's award of future medical costs.

Hamilton appeals, challenging the constitutionality of the statutory social security offset to his permanent total disability compensation. Walmart cross-appeals, contesting the Board's finding that Hamilton is permanently and totally disabled.

ANALYSIS

Hamilton asserts two constitutional flaws in the social security benefits offset that is required by K.S.A. 2017 Supp. 44-501(f). First, he claims it is unconstitutional on equal protection grounds and, second, he argues it denies him an adequate substitute remedy for the rights preempted by the Act. In its cross-appeal, Walmart asserts the Board's determination that Hamilton is permanently and totally disabled was not supported by the evidence in the record.

*Standard of review*

"Any action of the [workers compensation appeals] board pursuant to the workers compensation act, . . . shall be subject to review in accordance with the Kansas judicial review act by appeal directly to the court of appeals. . . . Such review shall be upon questions of law." K.S.A. 2017 Supp. 44-556(a).

The Kansas Judicial Review Act (KJRA) places the burden of proving an agency's action was invalid on the party asserting the invalidity. K.S.A. 2017 Supp. 77-621(a)(1). The KJRA limits the authority to grant relief to eight specified areas, of which two are relevant to this appeal and cross-appeal:

"The agency action, or the statute or rule and regulation on which the agency action is based, is unconstitutional on its face or as applied;

. . . .

"(7) the agency action is based on a determination of fact, made or implied by the agency, that is not supported to the appropriate standard of proof by evidence that is substantial when viewed in light of the record as a whole." K.S.A. 2017 Supp. 77-621(c)(1) and (c)(7).

"Statutory interpretation is a question of law subject to de novo review." *Whaley v. Sharp*, 301 Kan. 192, 196, 343 P.3d 63 (2014).

8

*Constitutionality of K.S.A. 2017 Supp. 44-501(f)*

*Equal protection*

Hamilton's equal protection argument is based on his claim that the social security offset has a disparate, negative effect on low wage earners who are permanently and totally disabled. "Whether a statute violates equal protection is a question of law subject to de novo review." *Hoesli v. Triplett, Inc.*, 303 Kan. 358, 369, 361 P.3d 504 (2015). In performing that review, we presume statutes to be constitutional and we must resolve all doubts in favor of a statute's validity. We must interpret a statute in a way that makes it constitutional if there is any reasonable construction that would support that interpretation. *Solomon v. State*, 303 Kan. 512, 523, 364 P.3d 536 (2015). The party challenging the statute bears the burden to demonstrate it violates equal protection. *Hoesli*, 303 Kan. at 369.

Courts evaluate equal protection challenges using a three-step process. The first step requires courts to determine whether the statute creates a classification resulting in different treatment of arguably indistinguishable individuals. In the second step, courts analyze the nature of the rights at issue to determine the appropriate level of scrutiny. Finally, courts determine whether the relation between the classification created by the statute and its goal withstands the appropriate level of scrutiny. *Miller v. Johnson*, 295 Kan. 636, 666, 289 P.3d 1098 (2012).

In its review, the Board found Hamilton was permanently and totally disabled. Generally, workers who are permanently and totally disabled are entitled to a certain weekly payment for the duration of their disability, up to a total payment cap set at $155,000. K.S.A. 2017 Supp. 44-510f(a)(1). The amount of the weekly payment is calculated based on the worker's average weekly wage. K.S.A. 2017 Supp. 44-510c(a)(1).

Because Hamilton was also receiving social security retirement benefits at the time of his injury, the Board applied the social security offset directed by K.S.A. 2017 Supp. 44-501(f) to his permanent total disability award. K.S.A. 2017 Supp. 44-501(f) instructs:

"If the employee receives, whether periodically or by lump sum, retirement benefits under the federal social security act or retirement benefits from any other retirement system, program, policy or plan which is provided by the employer against which the claim is being made, any compensation benefit payments which the employee is eligible to receive under the workers compensation act for such claim shall be reduced by the weekly equivalent amount of the total amount of all such retirement benefits, less any portion of any such retirement benefit, other than retirement benefits under the federal social security act, that is attributable to payments or contributions made by the employee, but in no event shall the workers compensation benefit be less than the workers compensation benefit payable for the employee's percentage of functional impairment. Where the employee elects to take retirement benefits in a lump sum, the lump sum payment shall be amortized at the rate of 4% per year over the employee's life expectancy to determine the weekly equivalent value of the benefits."

In this case, the weekly equivalent of Hamilton's social security benefits exceeded his weekly workers compensation disability payment, so after applying the offset the Board held Walmart did not owe anything other than Hamilton's functional impairment award.

Hamilton contends the social security offset violates equal protection because it results in different treatment for workers who are permanently and totally disabled based on whether they were low wage earners or high wage earners. Hamilton points out that if he had earned a higher average weekly wage, his weekly benefit from permanent total disability would exceed the weekly equivalent of his social security benefit. In that case, the offset would not totally eclipse the benefit attributable to his disability and he could still receive benefits up to $155,000. Admittedly, the social security offset still would

10

affect the size of Hamilton's payment for permanent and total disability. If the higher average weekly wage barely exceeded the social security amount, the weekly disability payment would be so small that the $155,000 cap likely would never be reached. Still, the benefit would not be zero.

The two classes Hamilton compares, therefore, are: (1) those who are permanently and totally disabled whose average weekly wage *does not* exceed the weekly equivalent of the social security benefits they receive; and (2) those who are permanently and totally disabled whose average weekly wage *does* exceed the weekly equivalent of the social security benefits they receive. The first group, which includes Hamilton, receives no payment under the Act for their permanent disability, while the second group does. Hamilton contends the different result violates the guarantee of equal protection.

As Walmart points out, however, "a facially neutral statute challenged under equal protection on the basis it has a discriminatory effect requires 'not only that there is a disparate impact, but also that the impact can be traced to a discriminatory purpose.' [Citation omitted.]" *Miller*, 295 Kan. at 666. K.S.A. 2017 Supp. 44-501(f) does not distinguish between low wage and high wage earners in its text. Therefore, Hamilton must demonstrate that the statute not only has a disparate impact on low wage earners receiving permanent total disability, he must also show the Legislature enacted it with discriminatory intent. Hamilton relies on the argument that two workers with the same work injury, both receiving social security benefits, should receive compensation under the Act irrespective of their average weekly wage. Hence, Hamilton has not alleged or argued the Legislature acted with discriminatory purpose.

In *Hoesli*, an injured worker challenged the social security offset, arguing it violated equal protection because it treated injured workers receiving retirement benefits differently than injured workers who were not. Our Supreme Court held the social security offset does not infringe on equal protection rights since it is rationally related to

11

the legitimate government objective of avoiding duplication of wage-loss benefits, thereby satisfying the constitutional rational basis test. *Hoesli*, 303 Kan. at 369-372; see also *Injured Workers of Kansas v. Franklin*, 262 Kan. 840, 870, 942 P.2d 591 (1997).

Hamilton argues that *Hoesli* is not dispositive because the injured worker in *Hoesli* was awarded permanent partial disability, rather than permanent total disability, and "[t]he permanent partial statutes do not have a provision that corresponds with the $155,000.00 payable to those who are rendered permanently and totally disabled." But while Hamilton's statement is correct, the mere existence of the distinction does not make the case.

Hamilton has not established an equal protection violation. First, although his claim is based on disparate impact, he offers no analysis or authority to show the disparate impact he claims can be traced to a discriminatory purpose. Second, *Hoesli* found the statutory classification in K.S.A. 2017 Supp. 44-501(f), distinguishing claimants receiving retirement benefits from those who are not, satisfied the rational basis test. Hamilton offers no rationale explaining why a further subclassification of retirement benefit recipients—into those whose average wage exceeds their social security benefits and those whose average wage does not—changes the *Hoesli* analysis. We find no equal protection violation.

*Adequate substitute remedy*

Hamilton next argues the statutory social security offset denies him an adequate remedy for his injury. Walmart argues Hamilton's minimal briefing of this issue should be found tantamount to raising the issue for the first time on appeal. However, the list of issues in the Board's order included Hamilton's argument claiming the social security offset to be unconstitutional, without specifying the grounds. And as the Board noted, it has no authority to decide a claim that a statute is unconstitutional.

Our Supreme Court has recognized three exceptions to the rule that issues not previously asserted, even if they present constitutional questions, may not be raised first on appeal:

> "(1) The newly asserted theory involves only a question of law arising on proved or admitted facts and is determinative of the case; (2) consideration of the theory is necessary to serve the ends of justice or to prevent the denial of fundamental rights; and (3) the district court is right for the wrong reason. [Citations omitted.]" *State v. Phillips*, 299 Kan. 479, 493, 325 P.3d 1095 (2014).

Hamilton's argument on this part of his claim is not extensive, but because we have already addressed one part of Hamilton's constitutional argument, and because fully considering this claim acts to serve the ends of justice, we consider the merits of his contentions.

Hamilton argues the social security offset abrogates his right to "remedy by due course of law" without providing an adequate substitute, in violation of the rights guaranteed to him by the 14th Amendment to the United States Constitution and § 18 of the Kansas Constitution Bill of Rights. Hamilton's claim presents only a question of law. *Solomon*, 303 Kan. at 523.

When the Legislature withdraws a remedy protected by due process, it must provide an adequate substitute remedy, or quid pro quo. *Bonin v. Vannaman*, 261 Kan. 199, 217, 929 P.2d 754 (1996). Courts follow a two-step analysis when evaluating quid pro quo challenges. In the first step, courts "determine whether the modification to the common-law remedy or the right to jury trial is reasonably necessary in the public interest to promote the public welfare. This first step is similar to the analysis used to decide equal protection questions under the rational basis standard." *Miller*, 295 Kan. at 657. In the second step, courts "determine whether the legislature substituted an adequate

statutory remedy for the modification to the individual right at issue." *Miller*, 295 Kan. at 657.

Hamilton does not address the first step of the quid pro quo analysis in his brief. Considering both Hamilton's burden to demonstrate the unconstitutionality of the social security offset and the presumption of constitutionality that we must apply, we presume the social security offset is reasonably necessary to promote the general welfare of the people of Kansas. Our analysis of the rational basis standard with respect to Hamilton's equal protection claim points to satisfaction of the first step even without application of the presumption.

As for the second step, the Kansas Supreme Court has noted "it is important to realize that the workers compensation remedy is not a common-law remedy. Rather, it is an adequate, substitute remedy itself . . . for the abrogation of a plaintiff's right to sue an employer for an injury incurred on the job due to the employer's negligence." *Injured Workers of Kansas*, 262 Kan. at 882. In exchange for the right to sue employers for work injuries, the Act allows employees "to quickly receive a set but possibly smaller sum of money for injuries received at work, regardless of whether the injuries were the result of the employer's negligence." *Injured Workers of Kansas*, 262 Kan. at 883.

Our Supreme Court has recognized that periodic amendments are likely for significant legislative schemes like the Act, and they "may be subsequently amended or altered without each subsequent change being supported by an independent and separate quid pro quo." *Injured Workers of Kansas*, 262 Kan. 840, Syl. ¶ 9. Instead, "the proper test to apply is whether the substitute remedy would have been sufficient if the modification had been a part of the original act." *Injured Workers of Kansas*, 262 Kan. 840, Syl. ¶ 9.

14

Hamilton challenges an amendment to the original Act. The Legislature added the social security offset in 1993 as one of a number of amendments. L. 1993, ch. 286, § 24. In *Injured Workers of Kansas*, however, the Kansas Supreme Court found that the Act, as amended in 1993, still provided an adequate substitute remedy. 262 Kan. at 888. The court acknowledged that after the 1993 amendments the quid pro quo was diminished compared to what it was prior to the changes. 262 Kan. at 884. Nevertheless, the court observed "[t]he amended Act still provides compensation for injured workers without proof of negligence or fault, a benefit not allowed under typical tort law" and concluded that "it cannot be said that the Act . . . has been emasculated to the point where it is no longer an adequate quid pro quo." 262 Kan. at 888. Hamilton fails to show why the holding in *Injured Workers of Kansas*, addressing his quid pro quo due process argument, should not control. We find that it does and the second basis for Hamilton's constitutional challenge fails.

*Walmart's cross-appeal*

On cross-appeal, Walmart argues the Board erred in finding Hamilton permanently and totally disabled. "The nature and extent of a workers compensation claimant's disability is a question of fact." *Goodell v. Tyson Fresh Meats*, 43 Kan. App. 2d 717, 723, 235 P.3d 484 (2009). When reviewing fact questions, our responsibility is to examine the record as a whole to determine whether the Board's factual determinations are supported by substantial evidence. "This analysis requires the court to (1) review evidence both supporting and contradicting the agency's findings; (2) examine the presiding officer's credibility determination, if any; and (3) review the agency's explanation as to why the evidence supports its findings. The court does not reweigh the evidence or engage in de novo review. [Citations omitted.]" *Williams v. Petromark Drilling*, 299 Kan. 792, 795, 326 P.3d 1057 (2014).

15

According to K.S.A. 2017 Supp. 44-510c(a)(2), "[p]ermanent total disability exists when the employee, on account of the injury, has been rendered completely and permanently incapable of engaging in any type of substantial and gainful employment. Expert evidence shall be required to prove permanent total disability." The Board found Hamilton was no longer able to find work in the open labor market and was permanently and totally disabled. In making this finding, it relied primarily on the opinions of Koprivica and Terrill, and Hamilton's testimony.

Koprivica was a board certified occupational medicine physician, and the parties stipulated he was qualified to offer opinions in this case. Koprivica recommended a number of permanent work restrictions for Hamilton. In his opinion, these restrictions would result in a 100 percent task loss based on Terrill's vocational report, and Hamilton could no longer perform any past relevant work.

Terrill also believed Hamilton was no longer able to obtain gainful employment. Based on Koprivica's restrictions, Terrill determined Hamilton had experienced a 100 percent task loss and could not return to any of his past relevant work. She concluded Hamilton could not perform any jobs in the unskilled labor market due to his age, education level, and Koprivica's restrictions.

Hamilton's testimony supports the opinions of Koprivica and Terrill. Hamilton was 70 years old at the time of his hearing. He had worked at Walmart since 1998 and had performed unskilled physical labor for at least the preceding five years. He had been an average student in high school. After graduating, he acquired some technical training in welding, air conditioning, and auto mechanics in the 1970s but never worked in any of those fields. Hamilton testified he had constant pain that made it difficult to sit or stand for long periods of time, and his foot drop prevented him from walking long distances. He also explained he resigned from Walmart because he felt he could no longer perform the job properly and was concerned about reinjury.

16

Walmart claims the evidence does not support the Board's finding because some evidence supported the position that Hamilton was still able to work. Walmart notes that Sprecker identified several jobs she believed Hamilton was capable of performing on a fulltime basis and it also points out that Ciccarelli, Hamilton's treating physician, released Hamilton to work without any permanent restrictions. Finally, Walmart highlights that Hamilton continued to work at Walmart after his injury until he resigned for reasons that, according to Walmart, had nothing to do with his physical ability to perform the work.

As Walmart points out, the record does contain evidence contrary to the Board's finding and we must consider evidence that detracts from the Board's finding as well as the evidence supporting it. Although we look at evidence both detracting from and supporting the Board's decision, however, we do not reweigh that evidence except to determine "whether the evidence supporting the Board's decision has been so undermined by cross-examination or other evidence that it is insufficient to support its decision." *Moore v. Venture Corporation*, 51 Kan. App. 2d 132, 138, 343 P.3d 114 (2015). In this case, the "other evidence" upon which Walmart relies does not undermine the Board's finding to the extent it is left without the necessary substantial support.

Additionally, the Board questioned the credibility of Ciccarelli and Sprecker. The Board noted Ciccarelli released Hamilton to work without restrictions, even though Hamilton's job tasks included lifting up to 50 pounds. The Board found this hard to square with Koprivica's and Carabetta's restrictions limiting Hamilton to lifting no more than 10 and 25 pounds respectively. The Board also highlighted that Koprivica and Carabetta examined Hamilton long after Ciccarelli did, and Ciccarelli himself admitted they were in a better position to determine Hamilton's more recent level of restrictions.

As for Sprecker, the Board recognized that she found Hamilton had a number of transferable skills that would help him obtain employment. But the Board also commented that many of these skills were "innocuous," such as the ability to perform

17

work safely and the ability to show up to work on time and concluded her argument that Hamilton possessed transferable skills was "weak at best." We must consider credibility determinations and the record supports these credibility determinations about Sprecker's opinions.

We find the Board did not err in finding Hamilton was permanently and totally disabled. Substantial competent evidence supports its finding and that finding has not been undermined by evidence to the contrary.

Affirmed.